Robert ZANI, Appellant,

v.

The STATE of Texas, Appellee.

No. 1211–84.

Court of Criminal Appeals of Texas,
En Banc.

June 29, 1988.

Second Motion for Rehearing
Dismissed Sept. 27, 1988.

Roy E. Greenwood, court appointed on appeal, Austin, Louis Dugas, Orange, for appellant.

Ronald Earle, Dist. Atty. and Andrew Forsythe, Asst. Dist. Atty., Austin, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

CLINTON, Judge.

Appellant was prosecuted in 1981 for the offense of murder with malice under the 1925 Penal Code. The offense was allegedly committed on July 23, 1967, in a convenience store in north Austin. A jury found appellant guilty, and assessed his punishment at 99 years confinement in the Texas Department of Corrections. The Texarkana Court of Appeals affirmed. *Zani v. State*, 679 S.W.2d 144 (Tex.App.—Texarkana 1984).

We granted appellant's petition for discretionary review in order to address a question expressly left open by our opinion in *Vester v. State*, 713 S.W.2d 920, 924 (Tex.Cr.App.1986), *viz:* "whether hypnotically-induced testimony is admissible in Texas." See also, *id.*, at 929–30 (Clinton, J., concurring).[1]

The State's case in this cause rests primarily upon circumstantial evidence placing appellant in the Town & Country Store between the hours of 7:00 and 8:00 a.m., on the morning of the murder. Sometime during that hour the clerk of the store, George Vizard, was shot to death in the cold vault. The only witness purporting to see appellant in the store during this period of time was a construction worker named Jerry Magoyne, Jr. During a hypnosis session conducted in 1980, Magoyne gave a description of a man he saw behind the counter of the store shortly before 8:00 a.m. After the session he picked appellant's picture out of a photo spread. These facts were elicited at trial, as well as Magoyne's testimony he was "positive" appellant was the man he had seen, though prior to hypnosis he could remember only that he had seen a white male in the store on the morning of the killing.

Appellant brings four grounds for review pertaining to the admission of Magoyne's

---

1. We also granted review of the Texarkana Court of Appeals' holding that the trial court did not deny appellant's constitutionally protected right to self representation because it found he "did not know how to proceed at the venue hearing and was unable to competently represent himself; therefore, he was not fully aware of the consequences of self-representation and this choice was not intelligently made." *Zani,* supra, at 149. The court of appeals also concluded his self representation "would have caused undue disruption and delay in the trial." *Id.* Although the instant writer would not do so, a majority of the Court now agrees that ground should be dismissed as improvidently granted. Tex.R.App.Pro., Rule 202(k). As always, our refusal to treat the merits should not be construed as approval by this Court of the language or reasoning of the court of appeals in reaching its decision on this issue. *Rodriguez v. State,* 745 S.W.2d 353 (Tex.Cr.App.1988).

identification testimony at trial. First he contends that hypnotically enhanced identification testimony is inadmissible under the criterion set out in *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (D.C.Cir.1923). Second, he argues he was entitled to have counsel present during the 1980 hypnosis session, under the Sixth Amendment of the United States Constitution and Article I, § 10 of the Texas Constitution. He further contends the trial court erred in refusing to hear testimony of his hypnosis expert in the course of a pretrial hearing to determine admissibility of hypnotically enhanced testimony. Finally, appellant argues the trial court erred in failing to submit either his requested or some other cautionary instruction in the jury charge, admonishing the jury not to assign disproportionate weight to Magoyne's hypnotically refreshed testimony. We first address at some length the threshold question of admissibility. Finding that in some instances hypnotically enhanced testimony may be admissible, we will remand the cause to the court of appeals to determine admissibility of Magoyne's testimony in accordance with the standard we set out today. We then treat appellant's remaining hypnosis-related grounds seriatim.

## I.

The State established that appellant had been a parttime employee at the Town & Country Store for about three weeks between mid-May and the early part of June, 1967. He knew how to operate the cash register, and, because he was sometimes responsible for opening or closing the store, he would have known the combination to the floor safe, hidden beneath a rubber mat behind the register. On the morning of July 23, a Sunday, there would have been "a fair amount of money" in the safe from the previous day. Located on the road to the lake, the store averaged about $1200 to $1500 in proceeds on Saturdays.[2]

Perhaps the most damning evidence against appellant, aside from Magoyne's identification testimony, was the presence, shortly after the killing, of certain items on the checkout counter of the store bearing his fingerprints. A roll of lifesavers, a package of fudge brownies and a loaf of bread were all shown thus to have been handled by appellant. There was testimony that the bread man "would make that store every day of the week, including Sunday." While it was not shown whether the bread man had yet been to the store when the killing occurred, the State did prove that none of these items had been left on the counter the previous night.

Vizard was shot and killed with "either a .38 Special or .357 Magnum caliber copper-coated bullet, [that] was fired from the weapon which would exhibit eight lands and grooves inclining to the right"—referred to throughout trial as a "right 8." Firearms fitting this description in 1967 were shown to be somewhat rare, comprising an estimated three to five percent of the total firearms population. In 1979, Mexican police seized from appellant a .357 Ruger Blackhawk, with serial number 78283. Records from a sporting goods store in Austin revealed appellant had bought this pistol on July 22, 1966. Several of appellant's contemporaries testified that "around" the time of the murder they had seen appellant in possession of a pistol "similar" to that later taken from him in Mexico. While the condition of the bullets recovered at the scene prevented a firm identification of appellant's pistol as the murder weapon, it was found to be of the "right 8" variety.

## II.

The trial court conducted a hearing immediately prior to trial in order to determine whether to admit Magoyne's testimony over appellant's objection, *inter alia*, that "there is no proper basis for permitting such testimony as a matter of scientific reliability." As proponent of the hyp-

2. The State endeavored to show robbery as a motive for the murder. Although evidence was adduced that appellant was in some financial difficulty at the time of the killing, it was not established that anything was actually taken either from the cash register or from the safe.

notically enhanced testimony, the State produced three witnesses at the hearing. James Michael Boulch, a teacher of hypnosis at Texas A & M University, one-time student of Dr. Martin Reiser of the Los Angeles Police Department,[3] and trainer of various Texas law enforcement personnel in the uses of forensic hypnosis, opined that it is "possible to restore a person's memory through the use of forensic hypnosis[,]" that "[i]nformation gained under hypnosis has proven to be very reliable[,]" and that posthypnotic memory is "more reliable than [that of] someone who would not be under hypnosis[.]" He acknowledged that "a person can lie under hypnosis[,]" and that "[o]ne common denominator in hypnosis is suggestibility, and that is why much care needs to be taken in a forensic hypnosis to be sure the person isn't led or is not given suggestions that could lead them into giving information that would not be correct." Although Boulch himself did not conduct the hypnosis of Magoyne, he was present at the session. He testified that no description or picture of appellant was imparted to Magoyne prior to hypnosis, nor during the session were answers suggested to him in any fashion. Texas Ranger Carl Weathers, trained by Boulch in techniques of forensic hypnotism, actually conducted the hypnosis of Magoyne. At the time of the session he had been unaware appellant was a suspect in the case. He agreed that no suggestion or leading took place.

Magoyne himself testified during the hearing that at no time was a description suggested to him, either before or during the hypnosis. Afterward a stack of photographs was given to him. When he reached the third photo in the stack, a picture of appellant, he announced, "That's the man." Before the hypnosis session, Magoyne had never been asked to view a lineup or photo array. On crossexamination he admitted, "I did not know before

hypnotism what I knew while I was hypnotized." He then identified appellant unequivocally as the man he saw behind the counter on the morning of the murder.

We have listened to the taperecording of the actual hypnosis of Mogoyne, as did the trial court prior to the hearing. A composite sketch was made during the hypnosis on the basis of questions asked both by Weathers and by the artist. From all we can gather from the tape, the questioning was not, by and large, overtly suggestive of particular answers. Magoyne's responses sound spontaneous. In fact, on those occasions where an answer was tentatively offered to him, he almost uniformly rejected it. Though both Weathers and the artist tried repeatedly to elicit information as to the color of the eyes, with Weathers attempting between efforts to place him deeper under hypnosis, Magoyne steadfastly declined to supply that information. In his testimony, Boulch alluded to this fact as indicative of an absence of "confabulation" during the hypnosis session. See Part III., *post.*

At the conclusion of the State's evidence on the hearing, appellant proffered Dr. Richard Garver, a clinical psychologist with a Board Specialty Certification in clinical hypnosis, and a consultant to the Federal Bureau of Investigation and other federal investigative agencies in forensic uses of hypnosis. Dr. Garver's testimony, according to appellant's bill of exceptions, would have gone to impugn the qualifications of the State's experts, to attack the procedures under which the hypnosis session was conducted and recorded, and to show "that in this case, generally and as a matter of law, this testimony was, if not absolutely, probably scientifically unreliable and should not go to the jury." However, the trial court ruled, without recourse to Dr. Garver's opinion, that Magoyne's identification testimony, though hypnotically retrieved, was sufficiently reliable to be

---

**3.** Boulch apparently subscribes to the "videotape recorder" theory of human memory. On crossexamination he testified:

"A. ... Once the information is there it is stored.

Q. It is stored. So, you are saying every event in the history of a person's life is stored and can be in some cases brought out.

A. Yes."

See our discussion *post,* however, and in *Vester v. State,* supra, at 925 (Clinton, J., concurring).

submitted to the jury for its consideration, with the fact of hypnosis going solely to the weight the jury might choose to assign it. Thus, Dr. Garver testified only at trial. The substance of his testimony before the jury comports with much we find in scientific and legal scholarship pertaining to the dangers of courtroom use of hypnotically "refreshed" memory. To that we now turn.

### III.

As a valid psychotherapeutic device hypnosis has long been accepted in the medical and scientific communities. American Medical Association: *Medical Use of Hypnosis. JAMA* 1958; 168: 186–189. In the therapeutic setting, however, the value of hypnosis is in no way contingent upon the historical accuracy of the memory that may come to light thereunder. Not so uniformly accepted is the use of hypnosis as a means of "refreshing" memory reliable enough to be vented in the criminal adversarial process. See American Medical Association: *Scientific Status of Refreshing Recollection by the Use of Hypnosis. JAMA* 1985; 253: 1918–1923, wherein it is recommended that "[t]he use of hypnosis with witnesses and victims to enhance recall should be limited to the investigative process[,]" and even then, should be subject to certain delineated safeguards, *id.*, at 1922–1923, designed to minimize the latent suggestiveness that is inherent in the phenomenon of hypnosis.

Proponents of the use of hypnosis to restore a crime victim's memory to facilitate his trial testimony, most notable of whom is Dr. Martin Reiser, a psychologist and forensic hypnotist with the Los Angeles Police Department, advocate a "videotape recorder" theory of human memory. By this theory the human mind is thought to receive and store in the subconscious every bit of data taken in by the senses. Hypnosis is regarded as a legitimate vehicle for tapping the subconscious to retrieve data recorded therein which has proven to be inaccessible to the subject's conscious memory. "The assumption, however, that a process analogous to a multichannel videotape recorder inside the head records all sensory impressions and stores them in their pristine form indefinitely is not consistent with research findings or with current theories of memory." *Id.*, at 1920. Currently accepted theories of memory deem it to be a reconstructive process as much as reproductive. Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int. J. Clinical Experimental Hypnosis 311, 321 (1979). The problem with hypnosis which sets it apart from other methods of "refreshing" a witness' memory is that it tends greatly to facilitate not only the retrieval of genuinely remembered data, but also construction of false but nevertheless plausible data to fill in gaps in true memory. Moreover, once this "confabulation" takes place, neither expert nor jury nor even the witness himself can differentiate historical fact from fantasy.

The Supreme Court of California, in its fairly exhaustive opinion in *People v. Shirley,* 31 Cal.3d 18, 723 P.2d 1354, 181 Cal. Rptr. 243 (1982), *cert. denied,* 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982), after a review of the pertinent professional literature on the subject, aptly identified and articulated the dangers of using hypnosis to "restore" the memory of an eyewitness or victim, thus:

"1. Hypnosis is by its nature a process of suggestion, and one of its primary effects is that the person hypnotized becomes extremely receptive to suggestions that he perceives as emanating from the hypnotist. The effect is intensified by another characteristic of the hypnotic state, to wit, that the attention of the subject is wholly focused on and directed by the hypnotist. The suggestions may take the form of explicit requests or predictions by the hypnotist; or they may be inferred by the subject from information he acquired prior to or during the hypnotic session, or from such cues as the known purpose of that session, the form of questions asked or comments made by the hypnotist, or the hypnotist's demeanor and other nonverbal conduct. The suggestions can be entirely unintended—indeed, unperceived—by the hypnotist himself.

2. The person under hypnosis experiences a compelling desire to please the hypnotist by reacting positively to these suggestions, and hence to produce the particular responses he believes are expected of him. Because of this compulsion, when asked to recall an event either while in 'age regression' or under direct suggestion of heightened memory ('hypermnesia'), he is unwilling to admit that he cannot do so or that his recollection is uncertain or incomplete. Instead, he will produce a 'memory' of the event that may be compounded of (1) relevant actual facts, (2) irrelevant actual facts taken from an unrelated prior experience of the subject, (3) fantasized material ('confabulations') unconsciously invented to fill gaps in the story, and (4) conscious lies— all formulated in as realistic a fashion as he can. The likelihood of such self-deception is increased by another effect of hypnosis, i.e., that it significantly impairs the subject's critical judgment and causes him to give credence to memories so vague and fragmentary that he would not have relied on them before being hypnotized.

3. During the hypnotic session, neither the subject nor the hypnotist can distinguish between true memories and pseudomemories of various kinds in the reported recall; and when the subject repeats that recall in the waking state (e.g., in a trial), neither an expert witness nor a lay observer (e.g., the judge or jury) can make a similar distinction. In each instance, if the claimed memory is not or cannot be verified by wholly independent means, no one can reliably tell whether it is an accurate recollection or mere confabulation. Because of the foregoing pressures on the subject to present the hypnotist with a logically complete and satisfying memory of the prior event, neither the detail, coherence, nor plausibility of the resulting recall is any guarantee of its veracity.

4. Nor is such guarantee furnished by the confidence with which the memory is initially reported or subsequently related: a witness who is uncertain of his recollections before being hypnotized will become convinced by that process that the story he told under hypnosis is true and correct in every respect. This effect is enhanced by two techniques commonly used by lay hypnotists: before being hypnotized the subject is told (or believes) that hypnosis will help him to 'remember very clearly everything that happened' in the prior event, and/or during the trance he is given the suggestion that after he awakes he will 'be able to remember' that event equally clearly and comprehensively. Further enhancement of this effect often occurs when, after he returns to the waking state, the subject remembers the content of his new 'memory' but forgets its source, i.e., forgets that he acquired it during the hypnotic session ('posthypnotic source amnesia'); this phenomenon can arise spontaneously from the subject's expectations as to the nature and effects of hypnosis, or can be unwittingly suggested by the hypnotist's instructions. Finally, the effect not only persists, but the witness' conviction of the absolute truth of his hypnotically induced recollection grows stronger each time he is asked to repeat the story; by the time of trial, the resulting 'memory' may be so fixed in his mind that traditional legal techniques such as cross-examination may be largely ineffective to expose its unreliability. [Footnotes omitted.]"

*Id.,* at 802–804. See also generally M.T. Orne, D. Soskis, D. Dinges, E.C. Orne & M. Tonry, *Hypnotically Refreshed Testimony: Enhanced Memory or Tampering with Evidence?,* National Institute of Justice (1985); Orne, *The Use and Misuse of Hypnosis in Court,* supra; Diamond, *Inherent Problems in the Use Of Pretrial Hypnosis on a Prospective Witness,* 68 Cal.L.Rev. 313, 332–334 (1980); Mickenberg, *Mesmerizing Justice: The Use of Hypnotically–Induced Testimony in Criminal Trials,* 34 Syracuse L.Rev. 927, 951–952 (1983); Note, *Hypnotically Enhanced Testimony in Criminal Trials: Current Trends and Rationales,* 19 Hous. L.Rev. 765, 774–777 (1982); *United States*

*v. Valdez,* 722 F.2d 1196, 1201–1202 (CA5 1984).

In short:

"Review of the scientific literature indicates that when hypnosis is used to refresh recollection, one of the following outcomes occurs: (1) hypnosis produces recollections that are not substantially different from nonhypnotic recollections; (2) it yields recollections that are more inaccurate than nonhypnotic memory; or, most frequently, (3) it results in more information being reported, but these recollections contain both accurate and inaccurate details. When the third condition results, the individual is less likely to be able to discriminate between accurate and inaccurate recollections. There are no data to support a fourth alternative, namely, that hypnosis increases remembering of only accurate information."

American Medical Association: *Scientific Status of Refreshing Recollection by the Use of Hypnosis. JAMA,* supra, at 1921.

## IV.

Practically every jurisdiction which has reviewed the question of the admissibility of hypnotically enhanced testimony since 1980 has at least addressed the claim that such testimony should be excluded because it fails to meet the criterion set out in *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (D.C.Cir.1923). There it was held as a matter of federal common law that "while courts will go a long way in admitting expert testimony deduced from a well recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.,* 293 F. at 1014.

Accordingly, some courts have admitted hypnotically enhanced testimony, subject to certain mandatory procedural "safeguards," on the assumption that when these safeguards are followed, hypnosis will yield memory "comparable to normal recall in its accuracy."[4] Many other

---

**4.** In *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981) the Supreme Court of New Jersey held that "hypnotically-induced testimony may be admissible if the proponent of the testimony can demonstrate that the use of hypnosis in the particular case was a reasonably reliable means of restoring memory comparable to normal recall in its accuracy." *Id.,* 432 A.2d at 92. In establishing reliability, the proponent must show by clear and convincing evidence compliance with the following guidelines, which the New Jersey court adopted from Orne, *The Use and Misuse of Hypnosis in Court,* supra:

"First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. This professional should also be able to qualify as an expert in order to aid the court in evaluating the procedures followed. Although we recognize that there are many other people trained to administer hypnosis and skilled in its use for investigative purposes, we believe that a professional must administer hypnosis if the testimony revealed is to be used in a criminal trial. In this way, the court will be able to obtain vital information concerning the pathological reason for memory loss and the hypnotizability of the witness. Furthermore, the expert will be able to conduct the interrogation in a manner most likely to yield accurate recall.

Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense. [footnote omit-

ted] This condition will safeguard against any bias on the part of the hypnotist that might translate into leading questions, unintentional cues, or other suggestive conduct.

Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form. This requirement will help the court determine the extent of information the hypnotist could have communicated to the witness either directly or through suggestion.

Fourth, *before* inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. The hypnotist should carefully avoid influencing the description by asking structured questions or adding new details. [Emphasis in original]

Fifth, all contacts between the hypnotist and the subject must be recorded. This will establish a record of the pre-induction interview, the hypnotic session, and the post hypnotic period, enabling a court to determine what information or suggestions the witness may have received during the session and what recall was first elicited through hypnosis. The use of videotape, the only effective record of visual cues, is strongly encouraged but not mandatory.

Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and the posthypnotic interview. Al-

courts have admitted testimony derived from perceptions demonstrated to have been recalled by the witness *prior* to hypnosis, but have excluded testimony as to any matter "remembered" only during or after the hypnotic session.[5] At least one jurisdiction to date has judged any witness hypnotized in order to enhance his recall of certain events to be incompetent to testify as to any matter concerning those events, regardless of whether it can be demonstrated that he recalled those events prior to the hypnosis.[6] A handful of jurisdictions continue to adhere to the position that the reliability of hypnotically enhanced testimony is primarily a question of weight and credibility, rather than admissibility, and expressly refuse to apply *Frye* at all.[7]

5. This position seems to have gained momentum in the past several years, and has been deemed the "emerging consensus." *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 263, 453 N.E.2d 484, 492 (1983), quoting *State v. Wren,* 425 So.2d 756, 760 (La.1983). And indeed, see, e.g., *Contreras v. State,* 718 P.2d 129 (Alaska 1986); *Alsbach v. Bader,* 700 S.W.2d 823 (Mo.1985); *Bundy v. State,* 471 So.2d 9 (Fla. 1985); *State v. Moreno,* 709 P.2d 103 (Haw. 1985); *State v. Haislip,* 237 Kan. 461, 701 P.2d 909 (1985); *People v. Nixon,* 421 Mich. 79, 364 N.W.2d 593 (1984); *State v. Flack,* 312 N.C. 448, 322 S.E.2d 758 (1984); *State v. Peoples,* 311 N.C. 515, 319 S.E.2d 177 (1984); *State v. Martin,* 101 Wash.2d 713, 684 P.2d 651 (1984); *Commonwealth v. Smoyer,* 505 Pa. 83, 476 A.2d 1304 (1984); *Robison v. State,* 677 P.2d 1080 (Okla. Crim.App.1984), *cert. denied,* 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984); *State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983); *Commonwealth v. Kater,* 388 Mass. 519, 447 N.E.2d 1190 (1983); *State v. Patterson,* 213 Neb. 686, 331 N.W.2d 500 (1983); *State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266 (1982). Cf. *State v. Seager,* 341 N.W.2d 420 (Iowa 1983); *Walraven v. State,* 255 Ga. 276, 336 S.E.2d 798 (1985); *Elliotte v. State,* 515 A.2d 677 (Del.Supr.1986); *People v. Wilson,* 116 Ill.2d 29, 106 Ill.Dec. 771, 506 N.E.2d 571 (1987).

By and large the federal circuits have rejected a *per se* rule of inadmissibility, requiring instead that the district court make a preliminary assessment of admissibility, considering various factors including adherence, *vel non,* to the *Hurd* guidelines, to determine whether "the proposed testimony is sufficiently reliable and whether its probative value outweighs its prejudicial effect, if any, to warrant admission." *Sprynczynatyk v. General Motors,* 771 F.2d 1112, 1123 (CA8 1985). See also *United States v. Valdez,* supra. This is essentially the test proposed in Note, *Awakening from the Exclusionary Trance: A Balanced Approach to the Admissibility of Hypnotically Refreshed Testimony,* 61 Tex. L.Rev. 719, at 741 (1982).

6. In *People v. Shirley,* 31 Cal.3d 18, 723 P.2d 1354, 181 Cal.Rptr. 243 (1982), *cert. denied,* 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982), the Supreme Court of California held that a hypnotized witness is rendered *incompetent* to testify as to any matter brought out during the hypnotic session, regardless of whether he had any prehypnotic memory of that matter. Such witness *could* testify, however, as to anything not discussed under hypnosis. This is apparently the rule in Minnesota as well, subject to a harm analysis. See *State v. Mack,* 292 N.W.2d 764 (Minn.1980); *State v. Blanchard,* 315 N.W. 2d 427 (Minn.1982); *State v. Ture,* 353 N.W.2d 502, 512–14 (Minn.1984).

The California legislature has since enacted a rule of evidence making the testimony of a witness who has undergone hypnosis admissible as to any matter remembered prior to the hypnosis, subject to certain stringent guidelines reminiscent of *Hurd,* and following a showing by the proponent of the testimony "by clear and convincing evidence that the hypnosis did not so affect the witness as to render the witness' prehypnosis recollection unreliable or to substantially impair the ability to cross-examine the witness concerning the witness' prehypnosis recollection." West's Ann.Cal.Evid.Code § 795. California has thus legislated what is in effect the most rigorous *per se* rule of exclusion to date short of a rule of incompetency.

7. A few jurisdictions have required the trial court to screen the hypnotic session to decide, as a matter of judicial discretion, whether it was so unduly suggestive as to undermine the reliability of incourt identification, under the totality of the circumstances. Thus, in *State v. Armstrong,* 110 Wis.2d 555, 329 N.W.2d 386 (1983), the Supreme court of Wisconsin rejected application of the *Frye* rule and applied instead a rule like that which has arisen to determine whether an out of court identification procedure was so suggestive as to deny due process under the Fourteenth Amendment. Once ad-

---

though it may be easier for a person familiar with the investigation to conduct some of the questioning, the risk of undetectable, inadvertent suggestion is too great.... Likewise, the mere presence of such a person may influence the response of the subject." *Id.,* 432 A.2d at 96–97. See also *State v. Beachum,* 97 N.M. 682, 643 P.2d 246 (1982); *State v. Weston,* 16 Ohio App.3d 279, 475 N.E.2d 805 (1984). If these safeguards are established, "the testimony is admissible [and] the opponent may still challenge the reliability of the particular procedures followed in the individual case by introducing expert testimony at trial, but the opponent may not attempt to prove the general unreliability of hypnosis." *Hurd,* supra, 432 A.2d at 95.

This Court has relied upon a *Frye* analysis to exclude testimony of the results of polygraph tests, see *Romero v. State*, 493 S.W.2d 206 (Tex.Cr.App. 1973), and of amytal sodium or "truth serum" tests, see *Cain v. State*, 549 S.W.2d 707 (Tex.Cr.App.1977). To date this Court has not passed upon the admissibility of hypnotically enhanced testimony in this context.[8]

### V.

The State maintains that we should avoid application of the *Frye* rule altogether, arguing that hypnotically refreshed testimony is not comparable to "expert testimony deduced from a ... scientific principle or discovery," the general acceptance of which remains in doubt. 293 F. at 1014. Like a majority of jurisdictions that have addressed this contention, however, we consider *Frye* "applicable because lay testimony that is dependent upon hypnosis cannot be logically dissociated from the underlying scientific technique." *Contreras v. State*, 718 P.2d 129, 134 (Alaska 1986). "The purpose of the rule is to prevent the jury from being misled by unproven and unsound scientific methods." *Alsbach v. Bader*, 700 S.W.2d 823, 829 (Mo.1985). Moreover, much of what is involved in de-

termining admissibility of posthypnotic recall under *Frye* would be duplicated in the trial court's decision, upon a defendant's objection, whether that recall should be excluded because "its probative value is substantially outweighed by the danger of unfair prejudice, ... or [it is] misleading [to] the jury." Tex.R.Cr.Evid. 403. Compare *Sprynczynatyk v. General Motors*, 771 F.2d 1112, 1123 (CA8 1985). In any event, we cannot accept the suggestion that we treat the fact that testimony has been hypnotically refreshed as purely an issue of weight or credibility, for consideration of the factfinder alone.

Application of the *Frye* rule does not necessarily translate, however, into a *per se* rule of exclusion of any testimony attributable to hypnosis. Whether it imposed a *per se* rule often depends upon what the particular court believed *Frye* requires in the context of hypnotically enhanced memory. For example, in *State v. Hurd*, 86 N.J. 525, 432 A.2d 86, 92 (1981), the Supreme Court of New Jersey perceived the *Frye* rule to require no more than a demonstration, once certain procedures are shown to have been followed, "that the use of hypnosis in the particular case was a rea-

---

mitted by the trial court, credibility of the hypnotically enhanced testimony may be attacked before the jury. See also *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (1984).

The Supreme Court of Mississippi has determined that, subject to minimum mandatory guidelines, including the requirement of "otherwise admissible corroborating testimony or physical evidence which tends to substantiate the hypnotically-enhanced statements[,]" such statements are admissible and the factor of hypnosis becomes a matter of weight or credibility, for the jury to consider. *House v. State*, 445 So.2d 815 (Miss.1984).

Other jurisdictions eschew the "guideline" approach as "improper and unworkable[,]" *Chapman v. State*, 638 P.2d 1280, 1285 (Wyo.1982), holding that "[t]he issue is properly one for the fact finder—as are all issues relative to the credibility of the witness," *id.*, at 1282, and that "[a]n attack on credibility is the proper method to determine the value of the testimony of a previously hypnotized witness," *id.*, at 1284. See also *State v. Brown*, 337 N.W.2d 138, 151 (N.D.1983); *People v. Smrekar*, 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979). But see *People v. Zayas*, 159 Ill.App.3d 554, 110 Ill.Dec. 94, 510 N.E.2d 1125 (1987).

**8.** A second attack to which hypnotic testimony may be vulnerable derives from the Sixth Amendment to the United States Constitution. It is argued that because hypnosis has the effect, *inter alia*, of rendering what may previously have been a tentative identification practically certain in the mind of the witness, the accused is effectively deprived of the ability to crossexamine him on his incourt identification. See, e.g., *State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982); *McQueen v. Garrison*, 814 F.2d 951 (CA4 1987); Belasic, *Trial by Trance: The Admissibility of Hypnotically Enhanced Testimony*, 20 Colum.J.L. & Soc. Prob. 237, 273–75, and cases cited in n. 271 (1986). Yet a third attack on hypnotically enhanced testimony reflected in the cases is that the hypnotic session was so unduly suggestive a procedure as to render any identification of the accused made thereunder violative of his due process rights under the Fourteenth Amendment to the United States Constitution, such that any incourt identification following that procedure would be tainted evidence. E.g., *Vester v. State*, supra; Belasic, *Trial by Trance*, supra, at 276–78. These constitutional attacks are not before us today.

sonably reliable means of restoring memory comparable to normal recall in its accuracy." See n. 4, *ante.* Proponents of this view of the application of *Frye* to hypnosis argue that ordinary eyewitness testimony is itself inherently suspect, and that a requirement of absolute historical accuracy of memory brought to light under hypnosis would demand more of the hypnotically refreshed witness than of the witness who did not undergo hypnosis. E.g., Perry, *The Trend Toward Exclusion of Hypnotically Refreshed Testimony—Has the Right Question Been Asked?,* 31 Kan.L.Rev. 579, 600–603 (1983). This is true, it is asserted, even though "the testimony of the witness whose recollection has been [hypnotically] revived presents no more potential for inaccuracy due to the disabilities of perception, memory, and articulation than that of any witness." Spector & Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?,* 39 Ohio St.L.J. 567, 591 (1977). According to this view, cross-examination of the hypnotist and the eyewitness will serve to expose any undue suggestiveness during the hypnotic session, while jury instructions may function to inform jurors "regarding the proper role of hypnosis as a memory aid rather than as an indicator of truth." *Id.,* at 595. In rejecting these claims, however, another commentator has observed:

"By simply requiring that hypnosis produce results comparable in accuracy to normal recall, the [*Hurd*] court ignores the fact that the hypnotic process itself is not comparable to normal means of refreshing memory. The problems of fantasy, confabulation, and hypersuggestibility are peculiar to the hypnotic state and cannot be eliminated or controlled. It is, therefore, impossible to determine in any given case whether hypnosis has produced memories comparably accurate to normal recall, or whether it has produced wild fantasy. A recognition of the fundamental differences between the process of hypnosis and the process of normal means of refreshing recollection has therefore led the majority of jurisdictions to apply the *Frye* standards in a more meaningful fashion. [footnote

omitted] Rather than merely asking whether hypnosis is generally accepted as a means of refreshing memory, these jurisdictions have required proponents of hypnotically-induced evidence to show that hypnotism is generally accepted as a means of *accurately* refreshing memory." [Emphasis in original.]

Mickenberg, *Mesmerizing Justice: The Use of Hypnotically–Induced Testimony in Criminal Trials,* supra, at 965. Still another commentator maintains that:

"safeguards cannot prevent the occurrence of the loss of critical judgment and confabulation; they cannot prevent the subtle and unobserved suggestions that create false memory; they cannot prevent the hardening of false memory; they may in fact increase the distortion level and mislead the jury into believing false memory."

Belasic, *Trial by Trance: The Admissibility of Hypnotically Enhanced Testimony,* 20 Colum.J.L.Soc.Prob. 237, 272 (1986). To the extent that ordinary "disabilities of perception, memory, and articulation" may be amplified by hypnosis, it will result in recall less accurate than would ordinarily be expected. That such amplification can escape detection in spite of safeguards would seem to merit a *per se* exclusionary rule.

Were we writing on an entirely clean slate we would be inclined to hold that it has not been shown that hypnosis is a generally accepted means of refreshing memory that is *either* historically accurate *or* comparable in accuracy to pristine recollection. Thus we would likely follow those jurisdictions which have fashioned a rule of *per se* exclusion of any evidence not documented or otherwise memorialized as the product of prehypnotic memory. The recent opinion of the Supreme Court of the United States in *Rock v. Arkansas,* —— U.S. ——, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), however, has rendered such a position untenable.

In *Rock v. Arkansas,* supra, the Supreme Court held that application of a *per se* exclusionary rule to ban any testimony deriving from the posthypnotic memory of a defendant denied her constitutional right,

stemming from the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, to testify in her own behalf. The Arkansas Supreme Court had ruled Rock's posthypnotic memories "inadmissible by either the *Frye* test, or some form of it, or by traditional evidentiary concepts[,]" citing its own Rule 403. *Rock v. State*, 288 Ark. 566, 708 S.W.2d 78, 80 (1986). The United States Supreme Court first held that "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." — U.S. at —, 107 S.Ct. at 2711, 97 L.Ed.2d at 49. After reviewing the literature and the caselaw of the various jurisdictions pertaining to hypnosis, the Supreme Court concluded:

> "Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnotic recollections. The State would be well within its powers if it established guidelines to aid trial courts in the evaluation of posthypnosis testimony and it may be able to show that testimony in a particular case is so unreliable that exclusion is justified. But it has not shown that hypnotically enhanced testimony is always so untrustworthy and so immune to the traditional means of evaluating credibility that it should disable a defendant from presenting her version of the events for which she is on trial."

— U.S. at —, 107 S.Ct. at 2714, 97 L.Ed.2d at 52. The Court found that the utilization of safeguards such as those enumerated in *Hurd*, the possibility of corroborating evidence, crossexamination of Rock herself, and expert testimony and cautionary instructions on the dangers of hypnosis could all serve as mechanisms for testing reliability of a defendant's posthypnotic testimony. *Id.* "In so finding, however, the Court disregarded the fact that experts dispute the efficacy of such measures." *The Supreme Court—Leading Cases*, 101 Harv.L.Rev. 119, 123–25 (1987).

■ The Supreme Court expressed no opinion on the validity of imposing a *per se* rule of inadmissibility of hypnotically re-

freshed testimony of any witness other than the accused. — U.S. at —, n. 15, 107 S.Ct. at 2712, n. 15, 97 L.Ed.2d at 50, n. 15. Clearly the federal constitution would not prohibit the states from imposing such a rule applicable only to the prosecution. Nevertheless, we are unwilling to impose such a rule of exclusion unilaterally against the State. For if safeguards, corroboration and traditional means of testing believability of eyewitness testimony are deemed sufficient tests of reliability to require admission of hypnotically refreshed testimony on behalf of the accused in certain cases, they must also be considered sufficient gauges of reliability to permit admission of such testimony when proffered by the State in certain others. See *People v. Romero*, 745 P.2d 1003, 1021, 1022 (Colo.1987) (Lohr, J., concurring) (Kirshbaum, J., concurring in part and dissenting in part). We therefore decline to adopt an exclusionary rule prohibiting the use of hypnotic recall in every case.

■ This is not to say that the proponent of hypnotically refreshed testimony ought not bear a heavy burden of showing it should go to the jury. We conclude that because of the uncertainties inherent in posthypnotic testimony it is appropriate to require the proponent of such testimony to demonstrate to the satisfaction of the trial court, outside the jury's presence, by clear and convincing evidence, that such testimony is trustworthy. In making its assessment of trustworthiness the trial court should be alert to the four-prong dangers of hypnosis: "hypersuggestibility," "loss of critical judgment," "confabulation," and "memory cementing." See Part III., *ante*. Factors involved in determining trustworthiness of hypnotic recall include, but are not limited to those we find in *People v. Romero*, supra, at 1017:

> "the level of training in the clinical uses and forensic applications of hypnosis by the person performing the hypnosis; the hypnotist's independence from law enforcement investigators, prosecution, and defense; the existence of a record of any information given or known by the hypnotist concerning the case prior to the

hypnosis session; the existence of a written or recorded account of the facts as the hypnosis subject remembers them prior to undergoing hypnosis; the creation of recordings of all contacts between the hypnotist and the subject; the presence of persons other than the hypnotist and the subject during any phase of the hypnosis session, as well as the location of the session; the appropriateness of the induction and memory retrieval techniques used; the appropriateness of using hypnosis for the kind of memory loss involved; and the existence of any evidence to corroborate the hypnotically-enhanced testimony." [9]

Obviously another factor would be the presence or absence of overt or subtle cuing or suggestion of answers during the hypnotic session. If, after consideration of the totality of the circumstances, the trial court should find by clear and convincing evidence that hypnosis neither rendered the witness' posthypnotic memory untrustworthy nor substantially impaired the ability of the opponent fairly to test the witness' recall by crossexamination, he may admit the testimony. See *Hankins v. State*, 646 S.W.2d 191, 203, n. 6 (Tex.Cr. App.1983) (Miller, J., concurring and dissenting). The opponent should then be allowed to adduce expert testimony before the jury pointing out both the dangers of hypnosis in general, and any perceived defects in the particular hypnotic session.

### VI.

■ Appellant asserts that he had a right under the Sixth Amendment of the United States Constitution to the presence of counsel during the hypnotic session of Magoyne.[10] Because the hypnosis took place in the absence of counsel, appellant maintains Magoyne's identification testimo-

ny at trial was tainted. In the court of appeals appellant argued that the hypnotic session was a "critical stage" of the criminal prosecution, thus invoking *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). The court of appeals essentially concluded that because the hypnosis session was not a trial-like confrontation involving the physical presence of the accused, no Sixth Amendment right inhered, relying on the rationale of *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973). Without passing on the question whether the hypnosis session here was a "critical stage" under Sixth Amendment analysis, we observe that it occurred some two and a half weeks before the indictment in this cause was filed.[11] Therefore, consonant with *Forte v. State*, 707 S.W.2d 89 (Tex.Cr.App.1986), we find that because formal adversary proceedings had not yet been initiated, no denial of appellant's Sixth Amendment right to counsel occurred.

### VII.

■ Appellant contends that in assessing admissibility of Magoyne's identification testimony in this cause, the trial court should have entertained the testimony of appellant's expert, Dr. Garver. The court of appeals rejected this contention on authority of Art. 28.01, § 1(6), V.A.C.C.P., observing that "[t]he court need not hold an evidentiary hearing, but may determine the merits of a motion to suppress evidence on the motion itself, opposing affidavits, or oral testimony," subject to the court's discretion. 679 S.W.2d at 148. Regardless of whatever discretion this provision vests in the trial court to refuse to permit *any* oral

9. These same factors would, of course, apply to an assessment of impermissible suggestiveness in the context of a due process analysis. However, it is the defendant who "shoulders the burden of demonstrating suggestiveness" in that context. See *Vester v. State*, supra, at 938 (Clinton, J., concurring). Here the State, as the proponent of suspect evidence, would carry the burden to show *lack* of undue suggestiveness, and hence, reliability.

10. In his petition for discretionary review appellant also invokes "the provisions of Texas law[,]" without identifying any. No such provisions were raised in or addressed by the court of appeals. Thus we find no decision of the court of appeals relating to provisions of state law for this Court to review.

11. The session took place on September 8, 1980. The indictment was filed September 25, 1980.

testimony on a motion to suppress once a hearing has been granted, however, when it has determined oral testimony *is* appropriate, and the parties join issue accordingly, clearly the trial court abuses its discretion in hearing testimony from only one party. This is particularly true where, as here, resolution of the complex admissibility issue will invariably call for an assessment of competing expert opinions. Thus, we agree with appellant that the trial court erred in failing to hear Dr. Garver's testimony at the pretrial hearing.

## VIII.

In his last ground for review pertaining to Magoyne's hypnotically enhanced testimony, appellant maintains that, contrary to the court of appeals' holding, an instruction should have been given, as requested at trial, admonishing the jury "to weigh [Magoyne's] testimony carefully" and "not [to] place any greater weight on this portion of the testimony than on any other testimony ... heard during this trial." Alternatively, he argues, having been alerted to the need, the trial court should have given some cautionary instruction of its own making to warn the jury against placing unwarranted faith in hypnotically refreshed testimony. It is true many commentators who oppose *per se* exclusion of such testimony have listed availability of such an instruction as one circumstance favoring admitting it.[12] Indeed, as we have already noted, in *Rock v. Arkansas,* supra, the Supreme Court included such an instruction among its mechanisms for assuring sufficient reliability of posthypnotic testimony to justify its admission in some cases on behalf of the accused.

■ We must nevertheless agree with the court of appeals that such an instruction would constitute a comment on the weight of the evidence. While it may be permissible in federal court, Wright, Federal Practice and Procedure, Criminal 2d § 488 (1982), such comment is expressly

forbidden by statute in Texas. Article 36.-14, V.A.C.C.P. See also Article 38.05, V.A. C.C.P. This Court has ruled that an instruction that jurors are the ultimate arbiters of the credibility and reliability of expert opinion testimony would amount to a comment on the weight of the evidence. *Florio v. State,* 532 S.W.2d 614, 618 (Tex. Cr.App.1976); *Clark v. State,* 500 S.W.2d 107, 111 (Tex.Cr.App.1973). See also *Russell v. State,* 694 S.W.2d 207 (Tex.App.— Houston [1st] 1985), *aff'd,* 749 S.W.2d 77 (Tex.Cr.App.1988). Such an instruction, though seemingly neutral on its face, has the effect nonetheless of singling out evidence and inviting jurors to pay it particular attention. In other contexts we have held requested instructions warning jurors of the inherent unreliability of certain kinds of testimony also to be an impermissible judicial expression as to the weight of the evidence. *Buxton v. State,* 646 S.W.2d 445 (Tex.Cr.App.1983) (In prosecution for an offense the Legislature has exempted from the requirement that accomplice witnesses be corroborated, an instruction cautioning jury that the testimony of such witness should be "scrutinized closely" is improper.); *Lemasters v. State,* 164 Tex. Cr.R. 108, 297 S.W.2d 170 (1956) (In a similar prosecution, instruction that a conviction may be had on the uncorroborated testimony of an accomplice is a comment on weight of the evidence.). Likewise, we now hold that an instruction that jurors afford hypnotically refreshed testimony no greater deference than they would ordinary testimony is foreclosed by Article 36.-14, supra. Of course, the opponent of such testimony may still present expert testimony as a predicate to attacking its reliability during final argument. Furthermore, the trial court should take into account the unavailability of such an instruction in ruling on admissibility of the testimony in the first instance.

## IX.

In Part VII. we concluded the trial court should have entertained the testimony of

---

**12.** E.g.: "Forceful instruction regarding the proper role of hypnosis as a memory aid rather than as an indicator of truth should adequately safeguard the jury's ability to gauge credibility."

Spector & Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?,* supra at 595.

Dr. Garver at the pretrial hearing. It seems unlikely, however, that Garver would have testified at the hearing any differently than he did at trial. The record thus presents an adequate basis for an appellate determination of admissibility of Mogoyne's posthypnotic testimony. Rather than reverse the cause and remand to the trial court for new trial for this error, we vacate the judgment of the court of appeals and remand the cause to that court for its assessment of admissibility under the test we have promulgated in Part V. of our opinion today.

The cause is remanded to the court of appeals for further proceedings not inconsistent with this opinion.

WHITE, Judge, concurring.

I join in the decision of the majority that "in some instances hypnotically enhanced testimony may be admissible." I agree with the standards for admissibility of hypnotically enhanced testimony which the majority sets out in its opinion. These factors constitute a workable and reasonable test for use by the trial courts of this State. I also join in the decision of the majority to dismiss the appellant's ground of self-representation as improvidently granted.

However, I disagree somewhat with the majority's rendition of the facts in the instant case. As for Mogoyne's pre-hypnotic memory, he not only recalled that he had seen a white male in the store, but also that the white male was behind the counter in the Town and Country Store on the morning of the murder. The man was waiting on customers, but Mogoyne noted he was not the usual Sunday morning attendant who had waited on him on previous occasions. Mogoyne, however, could not identify the man behind the counter who waited on him until after he was hypnotized.

The financial difficulties of the appellant were an important element of the State's case. This need for money combined with the appellant's knowledge of the Town and Country Store, provided evidence of both motive and opportunity for appellant to commit the crime.

The State proved at trial that, while enrolled in the University of Texas at Austin, the appellant was hired by Charles Dinges as a temporary store clerk at the Town and Country Store, working evenings during the week and mornings one day a weekend. He learned the combination of the safe, and he knew the store's routine was for a night's receipts to be taken to the bank on the following morning.

Appellant was also employed by the University on a part-time basis. In May, 1967, the appellant obtained his degree. He quit his job at the Town and Country Store during the first weekend of June, 1967. Appellant then got a job during the summer of 1967 as a Spanish translator for the Baker Center.

On June 27, 1967, appellant married Irma Serano, a Mexican citizen, in Mexico. Appellant could not get his wife into the United States at that time, and he returned to the U.S. without her. On July 5, 1967, the appellant enlisted in the Marine Corps, with a formal induction scheduled for the Fall. From June 15, 1967 until the day that Vizard was killed (July 23, 1967), the appellant's only source of income was his job at the Baker Center.

On August 1, 1967, appellant took two weeks leave of absence from the Baker Center to return to Mexico. Before leaving, he deposited his paycheck from the Baker Center, which raised his balance to $187.86. Prior to this deposit, appellant's bank account was overdrawn. On August 12 appellant returned from Mexico with his wife and family. He returned to work on August 17.

On September 14, 1967, appellant resigned from the Baker Center to fulfill his enlistment in the Marines. However, on September 15, 1967, he withdrew his application to the Marine Corps, giving the reason that he had financial indebtedness, along with a pregnant wife and two children to support.

The State believed these facts established the following conclusions: the appellant knew that a large amount of receipts from Saturday night would still be in the

store's safe on Sunday morning; appellant knew the combination of the safe; though he had less than $200 in early August, he was able to travel to Mexico and bring his pregnant wife and two children to the United States; and, lastly, after appellant returned from Mexico with a family to support, he left his job at the Baker Center and backed out of the Marine Corps.

At trial, the State did present evidence that money was taken from the Town and Country Store on the morning of the murder of George Vizard. The only uncertainty concerned the amount of money that was taken. There was no evidence to rebut this.

The manager of the Town and Country Store, Charles Dinges, originally reported that $300.00 was missing from the store's safe. On direct examination at trial, he explained that even more money was taken from the safe:

A. (Dinges): It was probably gotten out by me just making a statement that the change found was $300.00 for the store, because we had a definite policy that we would not give the media the amount of money, because we didn't want anyone to know the amount of money in the safe.

Q. Okay. Do you have an estimate of the amount of money that was in the safe on July 23rd?

A. The store averaged sales of about $1200 to $1500 every Saturday.

Dinges implied that instead of only $300.00 being taken from the store, there was over $1,000.00 taken from the store on the morning George Vizard was shot. This money included not only Saturday's receipts in the safe, but also an operating fund of $300.00 to $600.00 from the cash register.

In recounting the presence of the appellant's fingerprints from the items on the counter, the majority correctly noted that none of these items had been left on the counter when the store was closed the night before the murder. It was also shown that the next person in the store after it closed would have been George Vizard when he opened the store at 7:00

a.m. Sunday morning. Since the bread was delivered every day and appellant had not worked in the store in over a month, the implication was that appellant's fingerprints were on the items on the counter because he had been there at the time of the murder. Other than these few comments I agree with the majority's account of the trial and the facts in the instant case.

Instead of remanding the instant case to the Court of Appeals for review of admissibility in light of the test we have set out, I would have this Court resolve the issue before us. As the majority stated, the record before us is adequate to determine admissibility. Under the test we have promulgated, the testimony of Jerry Mogoyne, Jr. was properly admitted into evidence.

There are several factors which satisfy the test and support the conclusion that Mogoyne's testimony was admissible. The hypnotist, Texas Ranger Carl Weathers, was independent of the law enforcement personnel who investigated the case, as well as the attorneys for the State and the defense. At trial, Weathers testified that he knew nothing of the details of this case prior to the hypnosis session. There was a record in the instant case, by interview with Jerry Mogoyne, Jr., of what Mogoyne recalled prior to hypnosis. The hypnosis session was tape recorded. The majority concluded that the questioning was not overtly suggestive. Although two other persons were present during the session, they did not exert an influence on the subject during hypnosis. Lastly, there was sufficient corroboration, both direct and circumstantial, of the hypnotically enhanced testimony.

As corroboration, the police investigators discovered the presence of the appellant's fingerprints on three of the objects on the counter that morning. The fingerprints were present, even though appellant had not worked there in over six weeks. The objects had not been on the counter when the store was closed on the night before the murder. One of the objects bearing the appellant's fingerprints was a loaf of

bread, which was delivered fresh to the store on a daily basis. This evidence establishes the fact that appellant was in the Town and Country Store on the morning of July 12, 1967, around the store's counter, between opening time and the arrival of Jerry Mogoyne, Jr. This corroborated Mogoyne's testimony that he saw the appellant behind the counter. The fact that the appellant, at the time of the shooting, owned a firearm which was the same model and calibre as the murder weapon further corroborated the witness' testimony. The hypnotically induced testimony was corroborated by the State's evidence at trial.

Though I believe that the testimony of Jerry Mogoyne, Jr. satisfies the test set out by the majority, I do not dissent to the remand order of the majority.

Lastly, I do not agree with footnote eight of the majority opinion, wherein the majority discusses a Sixth Amendment attack to hypnotic testimony. The majority mentions that hypnosis might interfere with a defendant's ability to effectively cross-examine a witness against him. The appellant did not present this Sixth Amendment argument in this appeal.

I also disagree with footnote eight because I do not believe there is a reasonable Sixth Amendment claim in the instant case. When a witness is shown a photographic line-up, or a line-up with physical objects, in order to assist him in positively identifying a suspect, there has been no interference with a defendant's right to effectively cross-examine that witness.

Similarly, when Mogoyne was hypnotized in order to assist him in identifying a suspect, there was no interference with the appellant's cross-examination. In the instant case, the hypnosis session was properly conducted and was not impermissibly suggestive. I do not join in footnote eight.

I concur with the decision of the majority.

W.C. DAVIS and McCORMICK, JJ., join this concurrence.

ONION, Presiding Judge, concurring in part and dissenting in part.

I concur in the result reached and agree with the test promulgated in Part V of the majority's opinion. I dissent to the remand as a complete waste of judicial resources. The appellate record has been thoroughly examined and dissected by this Court, and we should apply the test which we have just devised. This can be easily and promptly done NOW. Instead, the majority remands the cause to the Texarkana Court of Appeals, where the voluminous record must be transferred at State's expense. Another case will be added to the caseload of the Court of Appeals. Then that court and its judges will have to reexamine and study the record before attempting to apply the test or standard adopted today. Thereafter, regardless of the decision, the cause undoubtedly will be back before this Court on some party's petition for discretionary review. This Court and its staff will have to expend the time and effort to determine whether the petition should be granted or refused. It will be argued that only this Court should be the court to finally decide whether the test has been properly applied so as to serve as a guide to the bench and bar of this State. Then this Court will have before it much the same question we could answer now. Who knows, by that time we may change the test and remand the cause again to the Court of Appeals for that court to review the cause again in light of the new test. Don't laugh. See *Rose v. State*, 752 S.W.2d 529 (Tex.Cr.App.1988) (opinions on rehearing).

The alleged offense in this cause occurred on July 23, 1967, almost 21 years ago. Appellant was not apprehended until 1979. His trial occurred in 1980, and eight years later the case is still in the appellate orbit, and by action of the majority today it will continue in orbit for months or perhaps years to come. There is no judicial economy in the ever-expanding "remand" procedure indulged in by the majority of this Court. I vigorously dissent to the remand of this cause.

TEAGUE, Judge, dissenting and concurring to majority opinion.

I find that under this Court's more recent decisions, such as *Martin v. State*, 630 S.W.2d 952 (Tex.Cr.App.1982), and *Blankenship v. State*, 673 S.W.2d 578 (Tex.Cr. App.1984), the court of appeals' decision to reject appellant's complaint that the trial judge erred in refusing to permit him to represent himself at his trial is clearly erroneous. Thus, the majority's decision to dismiss appellant's ground for review that concerns this issue, as having been improvidently granted, is also clearly erroneous. Thus, I dissent for this reason. However, neither the court of appeals' decision nor this Court's decision will preclude appellant from later seeking relief in federal court on this point, should he ultimately receive an unfavorable final judgment in this State.

I also dissent because the majority opinion errs in expanding the holding that the Supreme Court made in its decision of *Rock v. Arkansas*, 482 U.S. ——, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), to cover the admissibility of hypnotically induced testimony of *State's witnesses*. The issue in *Rock*, however, was clearly limited to the admissibility of hypnotically induced testimony of a defendant's witness, and did not concern the admissibility of like testimony from a State's witness. This Court should not permit *Rock*, supra, to be expanded, even under the guise of doing equity. In sum, this Court should hold that trial courts of this State may not allow juries of this State to convict accused persons on what many, including myself, consider at this time to be nothing less than irrelevant "gypsy-voodoo" evidence.

Nevertheless, given what the majority opinion of this Court holds concerning the admissibility of the State's witness's hypnotically induced testimony, I agree that this cause should be remanded to the court of appeals, "for its assessment of admissibility under the test we have promulgated in Part V of our opinion today." (Pages 245–246.) Of course, the court of appeals' decision on remand will be subject to review by this Court, should the "losing" party, be it the State or appellant, desire to file a petition for discretionary review. Therefore, I concur, but only concur to this part of the majority opinion.

The decision whether to admit hypnotically induced testimony of a State's witness does not, of course, concern defensive testimony. See *Rock v. Arkansas*, supra. The issue here only concerns the admissibility of hypnotically induced testimony of *a State's witness*.

The majority opinion opines that *but for* the United States Supreme Court decision of *Rock v. Arkansas*, 482 U.S. ——, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), a majority of this court "would be inclined to hold that it has not been shown that hypnosis is a generally accepted means of refreshing memory that is *either* historically accurate *or* comparable in accuracy to pristine recollection. Thus we would likely follow those jurisdictions which have fashioned a rule of per se exclusion of any evidence not documented or otherwise memorialized as the product of prehypnotic memory." (Page 242.) Nevertheless, using equity and equality as its guideposts the majority holds that hypnotically induced testimony of a State's witness may be admissible evidence against the accused.

I find that this court, over four years ago, at least implicitly, in *Burnett v. State*, 642 S.W.2d 765, 769 (Tex.Cr.App.1983), joined the majority of the States that held that evidence obtained as a result of hypnosis, no matter from what source, should never be admissible evidence because it is scientifically unreliable. The majority opinion actually gives excellent reasons for excluding such testimony from the fact finder. Because *Rock v. Arkansas*, supra, did hold that *a defendant* is entitled to introduce for the fact-finder's consideration hypnotically induced testimony, for Federal constitutional law purposes, an exception to the above general rule clearly exists today. And, because of Art. VI of the Federal Constitution this Court is prohibited from applying a per se exclusionary rule to hypnotically induced testimony of *the defendant or his witnesses*. As recognized by the majority opinion, when it comes to *a State's witness*, however, this Court is not

**250**

bound by what the Supreme Court held in *Rock v. Arkansas*, supra.

Those members who join the majority opinion, however, do not see fit to hold the line on this kind of evidence, which, as presented in the trial court, I find amounts to little more than self-taught "gypsy-voo-dooism", which I find might be warranted in finding a cure for the hiccoughs but not for finding the truth of the matter assert-ed.[1]

Although I have great confidence that, except such testimony that comes from a defendant or his witnesses, few trial judges of this State will ever admit such self-taught "gypsy-voodoo" testimony, as oc-curred here, and have greater confidence that most, if not all, juries will reject such testimony, I am nevertheless fearful that this Court in the future will bear witness to a battle in the trial courts of this State of self-taught "gypsy-voodoo" experts, with the result being delay, confusion of the principal issues of the trial, and unneces-sary expense to the parties and the coun-ties of this State.

When it comes to any other witness than the defendant, or the defendant's witness-es, I would invoke and apply what this Court stated in *Hopkins v. State*, 480 S.W. 2d 212 (Tex.Cr.App.1972). There, this Court was confronted with whether psychi-atric testimony concerning a State's wit-ness's psychological condition for telling the truth was admissible evidence for pur-poses of impeachment of the witness. For excellent reasons given, this Court held that such evidence was not admissible evi-dence.

If it is the will of this Court that the determination of whether such evidence go-ing to a State's witness is admissible should be decided according to principles of equity, applied in the spirit of fairness and equality, and not law, so be it. However, I hope that in the future, when this Court is confronted with whether certain favorable evidence offered by an accused should be admitted into evidence, for equitable and not legal reasons, it will not forget its "equity" evidentiary rule of law that it has created today.

For the above and foregoing reasons, I concur and dissent.

---

1. In case you are interested, it has been report-ed that one way to cure hiccoughs is through hypnosis. "Stand in front of the patient and look steadily between his eyes. Ask the patient to raise his right hand as high as possible until such becomes a slight strain. Make him main-tain this attitude for one minute. Then ask him to close his eyes. Make three passes across the throat in a slightly downward direction. This will cure the worst case of hiccoughs." *The American Journal of Clinical Hypnosis*, Vol. 23, Number 2, October 1980, under "Letters to the Editor".