Robert ZANI, Appellant,

v.

The STATE of Texas, Appellee.

No. 6–82–055–CR.

Court of Appeals of Texas,
Texarkana.

Feb. 28, 1989.

Roy Greenwood, Austin, for appellant.

Ronald Earle, Dist. Atty., Austin, for appellee.

GRANT, Justice.

This Court affirmed Robert Zani's conviction for the offense of murder with malice (in which he was sentenced to ninety-nine years in the Texas Department of Corrections) in *Zani v. State*, 679 S.W.2d 144 (Tex.App.–Texarkana 1984). The Court of Criminal Appeals remanded the case to this

Court for our review of the trial court's admission of posthypnotic testimony. *Zani v. State,* 758 S.W.2d 233 (Tex.Crim.App. 1988).

Jerry Mogoyne, Jr. was a customer in a convenience store in Austin in 1967 on the morning that a store clerk was shot and killed during a robbery. The State used hypnosis to restore his memory before the trial. Mogoyne testified that he saw Zani behind the counter of the convenience store on the morning that the store clerk was killed.[1] The Court of Criminal Appeals has instructed us to review his hypnotically re-freshed testimony to determine if the pro-ponent of this testimony satisfactorily dem-onstrated to the trial court, outside the presence of the jury, by clear and convinc-ing evidence that this testimony was trust-worthy. The trustworthiness is to be eval-uated with an awareness of four dangers inherent in hypnosis: hypersuggestibility, loss of critical judgment, confabulation, and memory cementing.

The Court of Criminal Appeals instructed that this inquiry be made on the basis of the totality of the circumstances,[2] consider-ing various factors in determining the trustworthiness of the hypnotic recall. These include (1) the level of training in the clinical uses and forensic application of hypnosis by the person performing the hyp-nosis; (2) the hypnotist's independence from law enforcement investigators, prose-cution, and defense; (3) the existence of a record of any information given or known by the hypnotist concerning the case prior to the hypnosis session; (4) the existence of a written or recorded account of the facts as the hypnosis subject remembers them prior to undergoing hypnosis; (5) the cre-ation of recordings of all contacts between the hypnotist and the subject; (6) the pres-ence of persons other than the hypnotist and the subject during any phase of the hypnosis session, as well as the location of the session; (7) the appropriateness of the induction and memory retrieval techniques used; (8) the appropriateness of using hyp-nosis for the kind of memory loss involved; (9) the existence of any evidence to corrob-orate the hypnotically-enhanced testimo-ny;[3] and (10) the presence or absence of overt or subtle cueing or suggestion of answers during the hypnotic session.

The only written account of the facts remembered by Mogoyne that was intro-duced in evidence was included in a supple-mental offense report made shortly after the incident in 1967. The report referred to statements made by both Jerry Mo-goyne, Jr. and his father, Jerry Mogoyne, Sr. The report included the following:

> They (Jerry Mogoyne, Jr. and his father) stated that they both knew the deceased from stopping in the store prior (sic) and he was definitely not the subject that was waiting on them.... Mr. Mogoyne, Sr. described #1 subject behind cash register as white male approximately 30 years of age, 5'10", 160 to 170 pounds, wearing what appeared to be khaki pants and solid, light colored shirt.... Mr. Mogoyne, Jr. stated that description that his father gave was right as far as he could tell except subject #1 appeared to him to be younger than what his father had given. Stated he looked to be be-tween 25 to 30 years of age.

There is no recorded account of what Mogoyne remembered immediately prior to undergoing hypnosis. The hypnosis ses-sion was recorded on cassette and took place in the hypnosis clinic of James Boulch located on Montrose Street in Houston, Texas. Texas Ranger Karl Weathers was the hypnotist. In addition to Weathers and Mogoyne, Boulch, Paul Ruiz, an Austin po-

---

**1.** The offense in this case occurred on July 23, 1967. Zani was not apprehended until 1979. The hypnosis session underlying this appeal oc-curred on September 8, 1980, and Zani was indicted on September 25, 1980.

**2.** This was the approach made in *People v. Romero,* 745 P.2d 1003 (Colo.S.Ct.1987), and *State v. Iwakiri,* 106 Idaho 618, 682 P.2d 571 (1984).

**3.** These factors were taken from the case of *People v. Romero,* 745 P.2d 1003 (Colo.1987). Dr. Morton Orne, an expert in hypnotically in-duced testimony, developed a similar list of safeguards which are cited in *State v. Hurd,* 86 N.J. 525, 432 A.2d 86, 95–97 (1981).

liceman, and Arthur Douet, a freelance artist, appeared.

Weathers testified that his duties as a Texas Ranger included investigative hypnosis, that he has an associate degree in law enforcement, that in 1980, he was one of twelve Rangers in the State to attend a one week course at the Texas Department of Public Safety Investigative Hypnosis Training School and that one of the instructors at this school was Boulch. Weathers further testified that he had read books, articles and periodicals about hypnosis and that he had employed hypnosis for the purpose of retrieving information from victims of crimes.

Boulch, who observed the hypnosis session, testified that Weathers used the proper procedure in the hypnosis session, that there were no suggestions made to Mogoyne as to what the individual behind the counter would look like, and that in his opinion Mogoyne was under hypnosis during the session. Boulch testified that he teaches forensic hypnosis at Texas A & M and other universities and that he also trains medical doctors, psychotherapists, psychological counselors, and police officers in hypnosis techniques. He testified that he started practicing hypnosis in 1970, but that he had actually been doing it on a full time basis for only four years. He was trained by Dr. Martin Reisser, a psychologist in the Los Angeles police department. He also attends advanced seminars on hypnosis and he trained at the University of Texas medical branch in San Antonio. He further testified that he had interned as a hypnotist under Dr. Coleman, a medical doctor in Houston, for 400 hours. In addition to teaching at Texas A & M University, he had conducted numerous seminars on hypnosis, including the training school at the Department of Public Safety Academy. He served as president for the Texas Association for Investigators and Analytical Hypnosis. He is the regional vice-president for the International Society of Professional Hypnosis, a charter member of the Houston Professional Hypnosis Association, and a member of the Association to Advance Ethical Hypnosis.

Weathers testified that he had not met or talked to Detective Ruiz before the day of the hypnotic session. Weathers testified that he had been told nothing about the suspect in the case except that Mogoyne had viewed the suspect behind the counter of a store. Weathers had no description of the person. He testified that Mogoyne and he discussed the occurrence prior to the hypnosis but that Mogoyne could not remember anything about the person behind the counter. Weathers testified that he followed the standard procedures and checklist[4] of the Texas Department of Safety by completing the proper form prior to the hypnosis and that he had a rapport-building session with Mogoyne in which they talked about Mogoyne, where he was from, his family, where Weathers was from and his family, and things in general in getting to know each other. He also discussed with Mogoyne the nature of hypnosis.

During the hypnosis, Mogoyne described the man behind the counter to the artist Douet, who made a sketch from the verbal

---

4. The checklist contained eleven questions answered as follows:
  1. Was consent obtained? *X*
  2. Does subject appear to be fatigued or depressed? *No*
  3. Does subject appear to be emotionally upset or intoxicated? *No*
  4. Is subject under medical treatment? *No*
  5. Is subject under treatment by a psychiatrist or psychologist? *No*
  6. Has subject ever been treated for a mental problem? *No*
  7. Have subject remove contact lens if worn. *None*
  8. Is subject known to be addicted to drugs or alcohol? *No*
  9. Has subject been interviewed within last 24 hours? ____ By whom? ____
  10. Does subject appear to be in good mental and physical condition? *X*
  11. Is someone from requesting agency present? *X*
And he added in handwriting on the printed form a twelfth area which he testified was his addition to the checklist to determine if the person had any phobias. Weathers testified that this was for the purpose of avoiding areas of thought that might make him resist induction into hypnosis.

description. After the hypnosis session, Mogoyne was presented five pictures by Ruiz, and Mogoyne picked the picture of Zani.

The following is the portion of the hypnotic session in which Mogoyne gives a description of the man behind the counter:

"Weathers: About what age is the man?

"Mogoyne: Twenties.

"Weathers: In his twenties. That's fine. That's good. That's very good. Now as you look on the film I wish that you would describe him from his hair all the way down to his neck. Starting with his hair, describe him down to his neck taking each part at a time starting with his hair. Now.... Now he is in complete focus.[5]

"Mogoyne: Dark hair.

"Weathers: That's fine.

"Mogoyne: Neat.

"Weathers: Neatly trimmed. That's fine.

"Mogoyne: Kind of waxy.

"Weathers: Good. You are doing very, very good. I need you to relax.

"Mogoyne: ... forehead.

"Weathers: High forehead or low forehead?

"Mogoyne: Higher than lower. Kind of combs to the side.

"Weathers: Can you tell me what side his hair is parted on?

"Mogoyne: I believe right part. To his right I think.

"Weathers: Very good.

"Mogoyne: Kind of a round or squarish-looking face.

"Weathers: That's very good.

"Mogoyne: Neat eyebrows. Not heavy.

"Weathers: Are the eyebrows arched or straight?

"Mogoyne: A little arched, I think. Yea, just a little arch.

"Weathers: Very good. Can you describe his eyes?

"Mogoyne: No.... Kind of boxy guy.

"Weathers: Very, very good. Continue to relax. Concentrate on clerk in the film. Now, can you describe his nose? Just as you see it on the film. In your own words, describe each characteristic that you can see on the film from his hair down to his neck.

"Mogoyne: His lips are defined, maybe a little ...

"Weathers: Do you mean thin?

"Mogoyne: No, heavier.

"Weathers: That's fine.

"Mogoyne: And the chin is defined maybe like a bulge on the end of it.

"Weathers: Would you say prominent? Is there a mark on it?

"Mogoyne: I guess it just shows up.

"Weathers: That's fine. That's very good. Keeping the film, the picture on the film, take one deep, deep breath and exhale very slowly. In just a moment you will hear the voice of the artist, Mr. Douet. He will discuss what this man looked like to you. In just a moment he will begin asking you questions about the man you see, the clerk on the film and each sound that you hear takes you deeper and deeper relaxed and makes the picture on the film focus sharper and sharper. Even more clearly than before.

"Douet: Can you say if this man was wearing glasses, spectacles or not?

"Mogoyne: No.

"Douet: Can you describe his eyes for me?

"Mogoyne: I don't see anything that I can describe—it's just—a square or flat-face. (Inaudible) Kind of boxy-looking face. That and the hair is dark. It's doesn't seem to be a definite part. Neat. The eyebrows are neat. And the eyes I guess just sorta fit into it. There's nothing —they're not wide, not narrow, they're not close to the nose, not a way away from the nose.

"Douet: Could you describe his nose to me?

5. Ellipses are used to indicate pauses and not omissions.

"Mogoyne: It's what I call defined. It's kinda rounded at the nostrils and its not heavy or thick. It's not very (inaudible) either, it's just ...

"Douet: Would you say his nose was long ...

"Mogoyne: No, short.

"Douet: short or medium?

"Mogoyne: Uh, medium.

"Douet: Would you say that his nose was straight or somewhat curved in some areas?

"Mogoyne: Curve there between the nose and the upper lip. Nose kinda curves around and comes out ending at the top of the lip. The mouth doesn't blend with the face. They're not large lips, but they're not small lips. They're not, I guess they're just average, but they are defined. The bottom of the lip comes down like the same curve out to the chin. The chin doesn't protrude, it justs—gotta lot of definition there that's ...

"Douet: Between the mouth and the chin would you say that the chin was a long chin or a short chin?

"Mogoyne: A short chin.

"Douet: A short chin?

"Mogoyne: Yea.

"Douet: Was this man wearing a beard or a moustache or was he clean shaven?

"Mogoyne: I would say he was clean.

"Douet: Would you call him somewhat good-looking or just say he was plain or ...

"Mogoyne: Cleancut. Neat.

"Douet: Remember saying that his nose was well-defined?

"Mogoyne: Yea and the nostrils a little curved.

"Douet: About where the nostril meets the face?

"Mogoyne: Meets the cheek. Yea.

"Douet: The curve is there. I see.

"Mogoyne: It's not significant but it's a little more defined than just the ...

"Douet: Is there a distance between the top lip and the nose, that you would say that it's close to the nose, the top lip, or would you say that there's a fair distance there?

"Mogoyne: Not long and it's, I think the curve, yea, I guess close. No, there's not a long distance between the nose and the lips.

"Douet: What about his forehead? Tell me about his forehead. Was it receding or was it ...

"Mogoyne: No, ...

"Douet: Coming forward?

"Mogoyne: It's not receding, it's not a very long distance, nothing unusual about it.

"Douet: Was his hair combed back or was it combed over the forehead somewhat?

"Mogoyne: Somehow it's not back and it looks like it could be to the side, but then it looks like it could be just slick and shiny.

"Douet: Slick and shiny. Would you say that the hair was very or exceedingly dark or would you say that it was somewhat brown, medium dark or ...

"Mogoyne: Medium dark.

"Douet: Medium dark.

"Weathers: You are doing very, very good Jerry. Now just continue to relax. Each breath that you take, each tick of the metronome, each sound that you hear takes you deeper and deeper relaxed continuing your focus on the face of the clerk and describing him to Mr. Douet.

"Douet: Would you say that this gentleman has a wide neck or thin neck?

"Mogoyne: About a medium neck.

"Weathers: You are doing very good. You're doing very, very good.

"Douet: Is it short or a long neck?

"Mogoyne: I guess it's about medium. Yea, it's about medium.

"Douet: Is his mouth wide from corner to corner or would you say his mouth was somewhat short?

"Mogoyne: More wider than short, but not wide. It would be straight. It wouldn't be a ... just a straight mouth.

"Douet: Yes.... Between his eyes, is there, would you say there is a ... where his eyes are ... a normal distance apart from each other or close set or far apart?

"Mogoyne: No, they are normal and they may be just a little wider than normal but close to normal.

"Douet: Yes. Would you say his eyes matched his hair being dark or would you say he had light eyes, gray eyes, blue eyes?

"Weathers: That's very good Jerry, very good. Looking at his eyes now, can you tell what color his eyes are? ... That's fine. That's fine. Can you distinguish if they are dark or light? His eyes, are they dark or light? ... You are doing very good. In just a moment I am going to count from three to zero. When I reach zero, I want you to turn and look at your father and focus clearly on your father, on his face, you see your father's face very clearly. Three, two, one, zero. When you are focusing on your father's face clearly raise the index finger of your right hand. That's good. That's very good. When I say now, I want you to turn back and look at the clerk once again, this time focusing even more clearly on than ever before while you continue to relax with each sound that you hear. Now.... Now he is much more clear than before, can you describe his eyes as to their size or anything that might be different about his eyes from anyone else's?

"Mogoyne: No.

"Weathers: That's fine. That's very, very good. Looking now at his forehead from his hairline down to his eyes, describe what you see.

"Mogoyne: Nothing abnormal. The distance is normal, the hair doesn't, the hair is all the way across the head.

"Weathers: From side to side? Does the forehead appear to be narrow or wide?

"Mogoyne: Wider than narrower than normal. Not ... it wouldn't be pointed or rounded, it would be square, but not, yea, boxy, but not full.

"Weathers: Are there any lines in the forehead?

"Mogoyne: No.

"Weathers: That's fine. That's good. And about what age did you tell me this man is?

"Mogoyne: Twenties.

"Weathers: In his twenties?

"Mogoyne: Yep.

"Weathers: Would you say ...

"Mogoyne: Yea, he's ... he looks twenties.

"Weathers: That's fine. Looking closer now on each side of nose and underneath his eyes toward his cheekbones, can you describe his cheeks and his cheekbones?

"Mogoyne: They protrude, they have some definition under each cheek.

"Weathers: Very good. Very good.

"Mogoyne: It's not puffy, just ... I want to say the hair is kinda kinky or curly or wavy, but I can't do it, for some reason it doesn't ... maybe the way it's combed.

"Weathers: That's fine. That's good.

"Mogoyne: He's not a big guy, about medium. He's clean.

"Weathers: Very good. Continuing to look now at his face, either side of his mouth, looking at his jaws. Are they thin or wide ...

"Mogoyne: Squared.

"Weathers: Squared? Very good.

"Mogoyne: It's the boxy face, it just ties in at the neck. But it's not a mean, it's not a rough face.

"Weathers: Very good. You are doing very, very good. Can you see his ears?

"Mogoyne: Yea, they are kinda flat. They're kinda ... don't protrude and they're not high.

"Weathers: Very good. Can you look now at his neck and tell me whether he has a long neck or a short neck?

"Mogoyne: It's about medium, it's ... like a sport shirt or white shirt collar and it fits in there.

"Weathers: Very good. About how tall is this man. Compare him to you.

"Mogoyne: He's about my height.

"Weathers: Very good.

"Mogoyne: Not heavy. Medium.

"Weathers: Now as you look at the man, he is looking at you. I want you to describe his eyes as he is looking at you.

"Mogoyne: I don't ... they aren't sunk in ... I can't see a color. I don't see anymore than that.

"Weathers: Very good. What about his complexion?

"Mogoyne: Not dark. Not light. Average.

"Weathers: That's very good. In just a moment, Jerry, I am going to count from three to zero. When I reach zero, I want you to stay deeply relaxed, but I want you to open your eyes and look directly in front of you at the drawing that Mr. Douet is doing and as you look at the drawing, keeping crystal clear in your mind the picture of the clerk, as you are looking at him, I want you to tell Mr. Douet any changes that you would like for him to make on the drawing and describe features more fully as you picture in your mind's eye the clerk. Three, two, one, zero. Open your eyes continuing to relax, looking only at the drawing and in your mind's eye looking only at the clerk.

"Mogoyne: Yeah, the ears are perfect.

"Weathers: That's fine. That's very good.

"Mogoyne: The part I, still doesn't come off. I—the hair looks good. The line looks good. The part (inaudible), I don't remember that.

"Weathers: Is the part more—

"Mogoyne: I don't remember a part actually, but I can't say that it's done any other way than that.

"Weathers: That's fine. That's good.

"Mogoyne: The lips. The little thing below the nose is good. The nose.

"Weathers: That's very good.

"Mogoyne: Forehead.

"Weathers: That's very, very, good. Looking at the eyes, now. Comparing the eyes on the drawing ...

"Mogoyne: I really—I can't say about the color. The whole deal looks good just like that.

"Weathers: Looking at the eyebrows now.

"Mogoyne: They weren't heavy, they could be just a little heavier, uh, okay, you've got the curve over to the side, yeah, not much. Neat.

"Weathers: Do you recall seeing any jewelry while you are looking at him now, can you see any jewelry? Can you see his hands?

"Mogoyne: No.

"Weathers: That's fine. When I say now, close your eyes, take one deep, deep breath, continue to relax. Now. Very good. Continuing to look at the picture, in your mind's eye of the clerk, and as you relax with each breath that you take, you feel all the tiny muscles in your scalp becoming deeper and deeper relaxed, muscles around your eyes relaxing even more. All the muscles in your neck becoming totally completely relaxed.... In just a moment, when I say now, I want you to look again at your father and focus your eyes on your father's face there in the store. Now.... Focusing clearly on your father's face for just a few moments, I am going to count from three to zero. When I reach zero, you will look again at the clerk and time will be standing dead still and it will be as if everything is completely out of focus to your eyes and your perception except the face of the clerk and it will be very, very sharp and clearly focused. Three, two, one, zero. Now I want you to describe to me the distance between the man's lips, his top lip, and his nose.

"Mogoyne: Not long. It's not long enough to say have a long heavy moustache, it's a little shorter than long.

"Weathers: Shorter distance than long distance?

"Mogoyne: Yeah, but its not's real short either.

"Weathers: Very good. Very good. In just a moment when I say now, I am going to ask you to reopen your eyes continuing to relax, look again at the drawing and this

time looking at the eyes more closely and make any changes that you wish to make, if any, on the eyes ... now.

"Mogoyne: That's good, but ...

"Weathers: Is there anything you would like the artist to try with the eyes to see if it would look better to you? More like the clerk to you? ... Does the drawing now look to you like the picture in your mind's eye? That's good. That's very good.

"Mogoyne: The part, uh ...

"Weathers: Should the ...

"Mogoyne: No, don't make it defined anymore than that.

"Weathers: Should it be less defined?

"Mogoyne: I don't know what's happening to the hair.

"Weathers: Okay, that's fine. That's good.

"Mogoyne: It doesn't go back.

"Weathers: Is the hair thin or thick?

"Mogoyne: It's about medium. It's not ... about medium. It appears ... no, it's about medium. It's not thick, it's not thin.

"Weathers: Looking at the drawing now, does the hair compare with the hair of the clerk?

"Mogoyne: Yea, probably should remove that receding area towards the part of ... yeah, I don't—and it needs more.... The hairline needs to be more straighter. Yeah.

"Weathers: You are doing very good, Jerry, very, very good.

"Mogoyne: I don't know what happens to it up there.

"Weathers: Okay, looking now at the jaws on each side of the mouth, do they look right to you?

"Mogoyne: Yeah, the cheeks have a definition, the chin has a definition, the top lip, the face is square.

"Weathers: That's good, that very good. Does his adam's apple protrude or do you see his neck, the front of his neck?

"Mogoyne: It doesn't protrude, but it's about normal. It's there.

"Weathers: Very good, very good. When I say now, I want you to close your eyes. Now. Picture ever more clearly the clerk in your mind's eye, concentrating now on his mouth and I want you to tell me if you can see his teeth.

"Mogoyne: No.

"Weathers: That's fine. That's good. That's very good. While looking at his mouth, is it straight at the corners or is it curled either up or down at the corner?

"Mogoyne: It's straight.

"Weathers: That's good. Very, very good.... Continuing to relax. As you are looking at the clerk, anything that you see now that you haven't described, I want you to describe it. Whenever you're ready.

"Mogoyne: Dark hair. Boxy, square face. No heavy eyebrows. They're not heavy, medium. Neat.

"Weathers: Are there any scars?

"Mogoyne: No.

"Weathers: That's very good. In just a moment Jerry, I am going to count from three to zero.

The sketch drawn by Douet.

Picture taken of Zani by the Austin
Police on March 28, 1980.

In accordance with the instructions from the Court of Criminal Appeals, we have reviewed this case specifically considering the dangers inherent to posthypnotic testimony of hypersuggestibility, loss of critical judgment, confabulation, and memory cementing. While some courts recognize that hypnosis can be a valuable and important investigative procedure,[6] it is also recognized that it can contaminate the mind of the person hypnotized.[7]

## HYPERSUGGESTIBILITY

The experts agree that hypnosis is a state of increased suggestibility in which a person's disassociated attention is constantly sensitive to and responsive to cues from the hypnotist. Indeed, suggestability is one of the requirements for hypnosis to be induced.

■ The only oral suggestion made by Weathers during the hypnotic session was that the man behind the counter who was to be identified was a white male. Suggestions are not only made by the words and the tone of voice of the hypnotist; body language and gestures can also suggest. For this reason, it would be better that a videotape be made of all the interaction between the hypnotist and the individual being hypnotized. This should include not only the hypnosis session, but it should also include the prehypnosis interview and the posthypnosis discussion. *State v. Hurd*, 432 A.2d at 95. Furthermore, the hypnotist and the subject should be the only people present at any phase of the session to avoid inadvertent communication by the observers to the subject in regards to their expectations, disappointments, or surprises in what the subject says.[8] Weather's testimony, however, indicates that he positioned himself beside and slightly behind Mogoyne during the hypnosis and that when Mogoyne's eyes were open during the hypnotic interview, Mogoyne was looking at the drawing and not at Weathers. Thus, Mogoyne's attention appears to have been focused on the hypnotist's voice and the artist's voice and sketching and there is no indication of diversion caused by communications from others in the room.

According to the testimony, the only person in the room who knew what Zani looked like was Ruiz, and he did not say anything during the hypnotic session. It is difficult to fathom that the hypnotist and the artist could convey to Mogoyne a description of Zani, when they themselves did not know what Zani looked like.

Some authorities contend that forensic hypnosis should be conducted only by mental health professionals.[9] On the other hand the hypnosis expert in *Harding v. State*, 5 Md.App. 230, 246 A.2d 302 (1968), explained it this way:

> Hypnosis is really—takes no great feat. Essentially anyone can do it, despite what appears to be a very mysterious kind of process. All that is involved in inducing a person into hypnosis is a very boring voice and monotonous repetition of words. Any of us can do it. The other thing that is necessary is a certain amount of willingness on the part of the individual [being hypnotized].

6. Proponents of hypnotically refreshed testimony contend that the hypnotized person goes into an altered state of consciousness in which he may experience a heightened ability to concentrate and an improved ability to reconstruct past events. Note, *Awakening from the Exclusionary Trance: A Balancing Approach to the Admissibility of Hypnotically Refreshed Testimony*, 61 Tex.L.Rev. 719 (1982).

7. *State v. Long*, 32 Wash.App. 732, 649 P.2d 845 (1982).

8. If investigators or representatives of the prosecution or the defense wish to observe, this should be done through a one way screen or remote television monitor to avoid jeopardizing the integrity of the session. M.T. Orne, D. Soskis, D. Dinges, E.C. Orne & M. Tonry, *Hypnotically Refreshed Testimony: Enhanced Memory or Tampering with Evidence?*, National Institute of Justice (1986). Furthermore, some authorities believe it preferable to have artists who are constructing a facsimile of a witness's mental image of a perpetrator to do so outside of hypnosis. This is to avoid the subject's mental image being altered by possible preconceptions of the artist concerning the appearance of the perpetrator.

9. Id. at 43.

Weathers, Boulch, and Mogoyne himself testified that Mogoyne was hypnotized. Dr. Richard Bennett Garver, the defendant's expert, conceded that lay hypnotists can obtain the same information as that obtained by a qualified health professional if the session is conducted without suggestive influences.

Ideally, forensic hypnosis should be conducted by a professional person whose status is independent of law enforcement, as well as of the defense. However, the hypnotist in the present case did not have a preconception of the description of Zani, and he was not trying to make a case against any particular person.

The memory retrieval technique used by Weathers was generally to allow a narrative flow about specific features, i.e. he asked Mogoyne to describe various areas of the face of the person he had seen behind the counter on the morning in question. At one point in the proceeding, the artist took over the questioning. He also asked open-ended questions. Without a videotape preserving when the artist drew in each item, we cannot know how his sketching of details related in time to Mogoyne's verbal description. For example, Mogoyne did not describe the philtrum, but apparently the artist had sketched it in anyway. While still under hypnosis, Mogoyne stated to the artist, "The little thing below the nose is good."

■ A memory loss that is repressed by emotional trauma is much more likely to be overcome by hypnosis than memory loss when there is no recollection, but not because of trauma. *State v. Hurd*, 432 A.2d at 97. Mogoyne's lack of recall was not brought about by emotional trauma, but this does not negate the possibility of his memory being hypnotically refreshed.

■ Weathers used a free narrative recall procedure, which required a minimal direction from the hypnotist. This technique is least likely to introduce inaccuracies and systematic bias, although this does not totally eliminate the risks of confabulation. M.T. Orne, D. Soskis, D. Dinges, E.C.

Orne & M. Tonry, *Hypnotically Refreshed Testimony: Enhanced Memory or Tampering with Evidence?*, National Institute of Justice (1986). Perhaps the best safeguard against the hypnotist's influencing the person under hypnosis by suggestions toward a description of a specific suspect is that the hypnotist have a total lack of knowledge of the suspect. To the extent the hypnotist lacks information, he is not in a position to bias, unduly influence, or contaminate the hypnotized person's recollections. *Id.*, at 33.

## CONFABULATION

Confabulation occurs when the party hypnotized creates memory perceptions in an unconscious effort to please the hypnotist. It is defined by *Dorland's Medical Dictionary* [10] as the "unconscious filling in gaps in memory with fabricated facts and experiences." It differs from lying in that the person has no intention to deceive and believes the fabricated memories to be real.

■ During the hypnotic session, Weathers kept trying to get Mogoyne to give him a description of the eyes of the man behind the counter. He kept coming back to this question, but Mogoyne answered that they were just ordinary eyes and he could not tell him the color. Mogoyne continued to resist this temptation to fill this gap by fabricating a description of the eyes. This lack of confabulation in this area does not prove that there was not confabulation about other matters, but it does show that Mogoyne was not in a state in which he was willing to supply every detail in order to please Weathers.

Mogoyne, at the suggestion of the hypnotist, saw only a face with no background. When asked how he knew that it was the man behind the counter, he replied, "I can't answer that." If the image was entirely fantasized, then it would be a coincidence that the description matched the suspect. Mogoyne testified that he had never seen the person working in the store on other occasions. Mogoyne also recalled being

10. *Dorland's Medical Dictionary* 372 (27th ed. 1988).

shown at least one photograph shortly after the incident occurred, but there was no testimony as to whether this photograph was of Zani. Sergeant Robert Kelton also testified that he may have shown Mogoyne a sketch shortly after the murder, but Mogoyne did not remember being shown a sketch.

## LOSS OF CRITICAL JUDGMENT

Critical judgment is the mental self-checking process of the human mind. Comment, *Hypnotically Enhanced Testimony in Criminal Trials: Current Trends and Rationales*, 19 Hous.L.Rev. 765 (1982). A hypnotized person may have mental perception which the person would consciously have known to be unrealistic, but just as reality is distorted in dreams, the hypnotized person loses the ability to make a mental evaluation of his ideas, images, and feelings. *Id.* at 776.

The hypnotized person suspends or lowers his critical judgment and may tend to respond to a demand for exact, photographic recall even though his actual recall is vague and doubtful. This uncritical acceptance is further enhanced by the hypnotized individual's expectations about the ability of hypnosis to aid in his memory.[11]

According to Mogoyne's testimony he did not have great expectations about the success of hypnosis in helping his memory. He testified that he did not think that he could help the investigation and that he did not understand hypnotism and did not know anything about it. There is no absolute way to determine if Mogoyne underwent some loss in critical judgment, but such a loss was not revealed in his testimony.

## MEMORY CEMENTING

The more the memory is gone over in the mind, the more the mind becomes convinced it is an accurate remembrance. This is called *memory cementing. Id.* at 777. This process is not limited to the field of hypnosis. For example, a witness may develop a false confidence after repeated interrogation and thought on the subject matter; however, it is said that the process is greatly accelerated during a hypnotic session. *Id.* at 765.

Some experts also contend that a previously hypnotized witness may develop a certitude about his memory that ordinary witnesses seldom exhibit.[12] It does not require research to establish that judges and juries are more likely to believe confident witnesses than witnesses who appear to be unsure of their recollection. Some authorities contend that the use of hypnosis destroys the probative value of any evidence that a witness might otherwise have been able to produce and makes the witness incompetent.[13] These authorities argue that hypnosis destroys the effectiveness of cross-examination as a safeguard for uncovering inaccurate testimony because the cross-examination will generally not shake the testimony of a witness who is convinced that his memory is correct. *See also Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Cross-examination, however, is usually conducted with the benefit of independent evidence, which may be used to impeach a witness if it includes prior inconsistent statements or contradictory testimony of other credible witnesses. The witness's credibility may also be discredited on the basis of an inability to observe. Note, *Awakening from the Exclusionary Trance: A Balancing Approach to the Admissibility of Hypnotically Refreshed Testimony*, 61 Tex.L.Rev. 719, 726 (1982). This does not eliminate the argument that pretrial hypnosis of a witness places an

---

**11.** M.T. Orne, D. Soskis, D. Dinges, E.C. Orne & M. Tonry, *Hypnotically Refreshed Testimony: Enhanced Memory or Tampering with Evidence?*, National Institute of Justice (1986).

**12.** Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Calif.L.Rev. 313, 348 (1980).

**13.** *Id.* at 332. Diamond, a Professor of Law at the University of California, Berkley, and a Clinical Professor of Psychiatry at the University of California, contends that hypnotically recalled memory is apt to be a mosaic of (1) appropriate actual events, (2) entirely irrelevant actual events, (3) pure fantasy, and (4) fantasized details supplied to make a logical whole.

obstacle in the way of effective cross-examination which might lead a witness to recant his identification of a defendant or at least to admit doubt. *See United States v. Miller*, 411 F.2d 825 (2d Cir.1969). There are chronic liars, however, who are also unshakeable on the witness stand.

In the present case, Mogoyne was cross-examined about the hypnotic session and about what he remembered had occurred on the morning in question. There is nothing in the record that indicates that Mogoyne's hypnosis caused memory cementing.

While there is no magic means of determining whether the memory has been enhanced at the hypnotic stage or merely hardened, jurors have the ultimate duty of ferreting out the truth of the testimony from the context of the entire case. For this reason, it is important that the procedures of the hypnosis be fully exposed in evidence, as they were in the present case, and that the dangers of hypnosis be revealed to the jurors, as they also were in this case. This enables the jury, as well as the trial judge and the appellate court, to examine the process for any possible taint and to be aware of the possible effects of hypnosis on the witness.

There is no way that the State can show absolutely that memory cementing and loss of critical judgment have not occurred. If the State must meet that requirement, then in effect the Court of Criminal Appeals has mandated an exclusionary rule prohibiting the use of hypnotic recall in every case. The Court of Criminal Appeals specifically stated that they were not adopting an exclusionary rule, and we interpret their opinion to mean that these cases will be reviewed on a case-by-case basis.

## CORROBORATION

The corroboration of hypnotically-enhanced testimony is an important element in determining its admissibility. There is substantial independent evidence to corroborate Mogoyne's identification of Zani as the person behind the counter on the occa-

sion in question. Zani's fingerprints were on a roll of life savers, a package of fudge brownies and a loaf of bread found on the store counter the morning of the murder. Bread was replaced at the store on a daily basis, precluding the possibility that the prints were left there the previous night. Furthermore, the store manager had cleared the counter at closing time the night before. The man behind the counter appeared comfortable clerking in the store. This is compatible with Zani's prior experience as a clerk in that store some six weeks earlier. There is evidence that as a former employee, Zani knew the combination to the safe, but the record does not clearly show that money was taken from the safe. Prior to the murder, Zani had purchased a handgun which the State's ballistic expert witness believed could have been the murder weapon.

## CONCLUSION

■ We conclude that hypnotist Weathers possessed sufficient expertise to perform the hypnosis and that he used appropriate techniques for the kind of memory loss involved. Although he was a law enforcement officer, he did not use that fact to influence the witness, and it has not been shown that the attendance of Officer Ruiz or James Boulch at the session in any way tainted the description. The hypnotist and the artist testified that they had no knowledge of who the suspect was or what he looked like at the time of the session. There is no indication of overt or subtle cueing or suggestions of answers that would taint the identification. Mogoyne's written account, as well as the oral account given to Weathers, does not contradict the ultimate identification of Zani. There is no indication that the hypnosis in any way negated Mogoyne's ability to recall past events or that there were any memories after his hypnosis that were inconsistent with his memories prior to the hypnosis. There is sufficient corroborating evidence that Zani was the person behind the counter.

The Court of Criminal Appeals does not apply the *Frye* test [14] of general scientific acceptance,[15] but rather bases its opinion on its conclusion that the State should be allowed to have hypnotically refreshed or restored witnesses because a defendant is allowed the same by a decision of the United States Supreme Court. *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). This balancing process does not require us to vouch for the accuracy of the testimony, but rather to determine whether the use of hypnosis and the procedure followed was a reasonably reliable means of restoring Mogoyne's memory.

As we have previously discussed, it is impossible to prove that hypnosis has absolutely no effect on a witness other than to restore his memory, but we do not interpret the Court of Criminal Appeals' opinion to require that the State reach that level of proof. We find that the State has fulfilled its burden to show by clear and convincing evidence that the hypnosis did not render witness Mogoyne's posthypnotic memory untrustworthy and that it did not substantially impair Zani's ability to test Mogoyne's recall by cross-examination. Thus, the testimony, the description, and the identification were admissible into evidence.

We again affirm the judgment of the trial court.

**14.** *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923).

**15.** In the case of *People v. Shirley,* 641 P.2d 775 (Cal.1982), the California Supreme Court found that the testimony of a witness who had undergone hypnosis for the purpose of restoring his memory of events was inadmissible on all matters relating to those events for the reason the hypnosis was generally unacceptable in the relevant scientific community for the purpose of memory retrieval. *See also Collins v. State,* 52 Md.App. 186, 447 A.2d 1272 (1982).