TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-98-00413-CR







Bobby Ray Sanchez, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT


NO. CR-98-0037, HONORABLE CHARLES E. MILLER, JUDGE PRESIDING








 Bobby Ray Sanchez, appellant, was convicted of capital murder and sentenced to
life imprisonment. See Tex. Penal Code Ann. § 19.03(a)(2) (murder in course of robbery) (West
1994). Appellant presents five issues for review, contending that the evidence is legally and
factually insufficient because the accomplice testimony is not corroborated; that the evidence is
legally and factually insufficient because the State failed to prove the aggravating element of
robbery; and that the trial court erred by admitting testimony tainted by hypnotism.

 Appellant's first four issues challenge the legal and factual sufficiency of evidence. 
However, his arguments on these points all raise the issue of sufficient corroboration of the
accomplice witness's testimony. Appellant's presentation confuses distinct issues. The court of
criminal appeals recently distinguished the standards of review for reviewing corroboration of
accomplice witness testimony from the standards for legal and factual sufficiency of evidence to
support a conviction. The court said: 


We decline appellant's invitation to impose legal and factual sufficiency standards
upon a review of accomplice witness testimony under Article 38.14. The
accomplice witness rule is a statutorily imposed sufficiency review and is not
derived from federal or state constitutional principles that define the legal and
factual sufficiency standards. See Malik v. State, 953 S.W.2d 234, 240 n. 6 (Tex.
Crim. App. 1997).



Cathey v. State, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999) (footnote omitted).

 In order to deal fairly with the points raised, we will first review the evidence to 
determine whether the accomplice witness's testimony is corroborated, and then consider the legal
and factual sufficiency questions. 


Factual Background

 About 1:00 p.m. on January 14, 1997, a Monday so cold and icy the schools were
closed, three members of the "Mexican Mafia" took a fourth member of their criminal
organization, Willie Herbert, Jr., to a spot on Old Stagecoach Road, also known as Five Mile
Dam Road, between Kyle and San Marcos in Hays County, shot him eight times with two pistols,
and left his body where he fell face down in an icy ditch alongside the road. 

 Donn Brooks, a school teacher and former law enforcement officer, was driving
his pickup truck on the same road when he saw three men moving in the road; he saw two cars,
one blue and the other white, parked on the side of the road to his right; on the left side of the road
he saw a body in the ditch. One man was on the left side of the road nearest the body. Brooks
testified that he drove within five feet of this man and saw him clearly. Brooks did not stop, but
drove to a convenience store and called 911. Brooks later identified appellant from a photographic
line-up as the man he saw nearest the body, and positively identified appellant in court as the man
he saw that day. 

 Other witnesses came upon the scene only minutes after Brooks. Jodi Prinz noticed
a blue Grand Am on the side of the road idling, as he could see the exhaust in the cold air, then
saw a man's body in a ditch on the other side of the road. He stopped and called 911 on his cell
phone. The 911 dispatcher testified that Prinz's call was received at 1:21 p.m. 

 Prinz did not approach the body until a man and a woman in a pickup stopped. The
woman, Linda Arriaga, testified that she and her friend had just driven on this part of the road 
on their way to Five Mile Dam, and the area was clear. Fifteen minutes later when they drove
by the same spot on their way back to Kyle, they saw the blue Grand Am, the body in the ditch,
and Prinz's truck. The time of the shooting was thus established as somewhere between 1:05 and 
1:21 p.m. Prinz, Arriaga and her friend walked toward the ditch and saw bullet holes in the man's
body. They also saw a small white car go by. Arriaga noticed the car and thought it unusual that
instead of slowing down when it passed, it speeded up. The first law enforcement officer arrived
at 1:29 p.m. He found the body still warm. Steam rose in the cold air from the bullet wounds in
the victim's head and back. The ensuing search of the area yielded several .380 caliber and 9 mm
shell casings and blood splatters. The trail of evidence showed that the victim had gone from a
car on one side of the road to where he fell in the ditch on the other side while being shot several
times with two different guns. 

 Herbert's girlfriend, Gloria Sisneroz, testified that she last saw him when he took
her to work in the blue Grand Am that morning at about 11:30 a.m. He was to pick Gloria up
after work to go to a building supply store to get a skirt for their trailer house. Gloria testified that
when he left her he had five hundred dollars they intended to use to make this purchase. No wallet
was found on his body, and he had only $4.03 in his pockets. 

 Sisneroz testified that three men had come to see Herbert the evening before he was
killed. She identified the men as "Rey," "Hippie," and appellant. Rey took Herbert to a back
bedroom to speak privately for about five minutes, after which the three visitors left. After they 
left, Herbert was very afraid, nervous and preoccupied. He was not able to sleep that night. The
next morning he begged Gloria to stay with him rather than go to work, but she insisted she had
to work. He did not tell her what was worrying him. 

 Steve Emmons testified that he was a member of the "Mexikanami," or "Mexican
Mafia," and that he helped plan the murder. The State conceded that Emmons was an accomplice
witness, and the trial court instructed the jury that his testimony had to be corroborated. Appellant
argues that Emmons's testimony is uncorroborated. 

 Emmons testified that Rey Ramirez was the organization's "general" of the region
of Texas that includes San Marcos and Austin. Appellant was the leader of the Mexican Mafia
in the San Marcos area. The victim, Herbert, was a "lieutenant" who lived in Austin. About two
weeks before the murder, Emmons was at appellant's apartment in San Marcos when he, Rey
Ramirez, Bobby Trevino, appellant, and Juan Sanchez planned the murder because Herbert had
taken delivery of fifty pounds of marihuana being distributed by the organization that he had no
authority to receive, and he did not pay for it. At this meeting, appellant volunteered to "do the
hit with Rey." Emmons was also present at a second meeting in Austin at which appellant told
the Austin members that he had volunteered to do the murder with Rey. 

 On the day of the murder, Emmons was babysitting Bobby Trevino's children. 
Emmons had only recently been released from prison and lived with the Trevinos. About 1:30-2:00 p.m., Trevino returned home in the company of Rey Ramirez and appellant. Emmons asked
how it had gone, and appellant proceeded to "give a rundown on what happened." Appellant told
Emmons that "everything's all right. He is gone, he is dead." Appellant said the murder had
taken place in Kyle close to Five Mile Dam. Shortly after they arrived, Ramirez said they had to
get rid of the car, and he and appellant left in the small white car that appellant's wife, Virginia,
had rented from an agency in San Marcos. Emmons later learned witnesses had driven by and
observed what was happening, and saw the car as well as the three men.

 Appellant related the murder details to Emmons a few days later. When the group
met with Herbert, he had injected a shot of heroin and was high. He went with them voluntarily
to Five Mile Dam near Kyle on the pretext of meeting a new "brother" who had a large amount
of heroin he could supply to everybody. Trevino drove Herbert's blue Grand Am, and appellant
and Ramirez were in the small white car. They stopped the cars, everyone got out, and appellant
and Ramirez drew their guns and started firing at Herbert, who started running. Appellant had
a .380 semiautomatic and Ramirez had a 9 mm Glock. Just after Ramirez fired the last shot into
the back of Herbert's head, they turned to walk back to the white car, and saw a white pickup
truck drive by. Appellant told Emmons that he "tripped out" and covered his face, but did it with
the hand holding the gun. Emmons testified that appellant did not tell him that they took money
from Herbert but told him that they had looked for his wallet. Appellant said Ramirez patted
Herbert's pockets but did not find a wallet. Emmons testified that one of the main things they
needed to get from Herbert was his wallet because it contained addresses and phone numbers of
other Mexican Mafia members and it "draws heat." Emmons said: "[W]e didn't want anybody--the officers--to be able to get this kind of information." He said that if there had been money in
it, they would have taken that, too.

 On cross-examination, appellant's attorney questioned Emmons about the looks he
exchanged with appellant during trial. Emmons explained that while in jail he had received threats
on his life and that his look was to let appellant know that he was not backing down, would not
be a coward, and would testify against him in court. 

 James Young, a Hays County corrections officer, testified that on July 11, 1997,
he was on duty monitoring prisoners, including appellant. Appellant had just returned from seeing
a visitor and a group of inmates gathered around him. He told the others that he had hired a
private detective "to find out who snitched us off." He lifted up his mattress, checked a piece of
paper, and said, "Yes, I gave them the right address," referring to the address of the person he
thought had done it. He said: "If I find out that's who it was then I'm going to call my friends." 
As he said this, he took the back of one hand and slapped it against the other and said "I'm going
to get him." When asked if he was sure that he knew who had spoken against him, he said,
"Yeah, he knows all my transactions and connections." 

 A rental car employee identified records showing that Virginia Sanchez rented a
white Dodge Neon on January 10, 1997. The car was returned at 2:24 p.m. on January 14, and
it was exchanged for a red Ford Aspire. The white car was not damaged and no complaint or
reason for turning it in was in the records. Banking records introduced showed that Virginia
Sanchez and appellant had a joint bank account and shared a residence in San Marcos.

 The medical examiner testified that Herbert died of eight gunshot wounds, including
entrance wounds to the back of the head, left side of the face, upper back, lower back, left thigh,
and upper right arm. Chemical tests revealed that he had recently taken heroin. Photographs of
his body showed numerous tattoos that Emmons identified as representing membership in the
Mexican Mafia.


Corroboration of Accomplice Testimony

 Under Texas law, a conviction cannot stand on accomplice testimony unless it is
corroborated by other evidence tending to connect the defendant with the offense; the evidence
does not corroborate sufficiently if it merely proves the commission of the offense. Tex. Code
Crim. Proc. Ann. art. 38.14 (West 1979); Cathey v. State, 992 S.W.2d at 462; Colella v. State,
915 S.W.2d 834, 838-39 (Tex. Crim. App. 1995). It is not necessary that the corroborative
evidence directly connect the defendant to the crime or that it be sufficient in itself to establish
guilt; it need only tend to connect the defendant to the offense. Reed v. State, 744 S.W.2d 112,
126 (Tex. Crim. App. 1988). If the combined weight of the nonaccomplice evidence tends to
connect the defendant to the offense, the requirement of corroboration has been fulfilled. Gosch
v. State, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991). The test is as follows:


 The test for weighing the sufficiency of corroborative evidence is to
eliminate from consideration the testimony of the accomplice witness and then
examine the testimony of other witnesses to ascertain if there is evidence which
tends to connect the accused with the commission of the offense. The
nonaccomplice evidence need not be sufficient in itself to establish the accused's
guilt beyond a reasonable doubt. Nor is it necessary for the nonaccomplice
evidence to directly link the accused to the commission of the offense. The
accomplice witness rule is satisfied if there is some nonaccomplice evidence which
tends to connect the accused to the commission of the offense alleged in the
indictment.



Hernandez v. State, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997) (citations omitted).

 To prove the capital murder charge against appellant, the evidence need not 
corroborate both the alleged robbery as well as the alleged murder. Holladay v. State, 709
S.W.2d 194, 199 (Tex. Crim. App. 1986). The court of criminal appeals has consistently
maintained that "accomplice witness testimony in a capital murder case does not require
corroboration concerning the element of the aggravating offense, i.e. the elements which
distinguish murder from capital murder." McDuff v. State, 939 S.W.2d 607, 613 (Tex. Crim.
App. 1997).

 On this record, numerous corroborating facts tend to connect appellant to the
offense:

 (1) Appellant and Rey Ramirez and one other person visited the victim on the night
before the murder, and after the visit, the victim was very agitated and nervous and could not
sleep.

 (2) Three nonaccomplice witnesses, Donn Brooks, Jodi Prinz, and Linda Arriaga,
all saw a small white car near the scene of the crime very close to the time of the offense. A small
white car rented by appellant's wife was returned to the rental agency only an hour after the
murder and exchanged for a red car, even though the white car was not damaged and no
explanation for the trade was recorded.

 (3) Appellant was overheard talking to other jail inmates making a threat about
finding and getting the person who "snitched them off." He said he had hired a private detective
to find out who did the snitching, and that he was going to call his friends to get that person.

 (4) Appellant brought up the matter of hateful looks between appellant and Steve
Emmons in the courtroom, and Emmons explained that the reason for the looks was that his life
had been threatened, and he wanted to communicate to appellant his resolve to go through with
his testimony despite the threats.

 (5) Donn Brooks identified appellant as one of the three men he saw at the scene
of the crime. See Burks v. State, 876 S.W.2d 877, 888 (Tex. Crim. App. 1994) (evidence that
appellant was seen in close proximity to the scene of the crime during the time the crime occurred
will tend to connect him to the offense).


 Viewing all of the corroborating facts together, we find that appellant's visit to the
victim's home the night before the murder at least establishes that appellant knew the victim, that
he associated with Rey Ramirez, who was also implicated in the murder, and shows that appellant
was involved in some activity that severely frightened the victim. 

 Appellant's threat about getting the "snitch" and Emmon's testimony about threats
on his life and his understanding that the threats were intended to discourage him from testifying
show a consciousness of guilt on appellant's part. As we have previously stated:


 A 'consciousness of guilt' is perhaps one of the strongest kinds of evidence
of guilt. It is consequently a well accepted principle that any conduct on the part
of a person accused of a crime subsequent to its commission, which indicates a
'consciousness of guilt' may be received as a circumstance tending to prove that he
committed the act with which he is charged.



Torres v. State, 794 S.W.2d 596, 598-99 (Tex. App.--Austin 1990, no pet.). In Torres, we cited
cases in which efforts of an accused to intimidate or threaten a State's witness was considered
admissible to show a consciousness of guilt. Id.; Johnson v. State, 583 S.W.2d 399, 409 (Tex.
Crim. App. 1979) (attempt by party to suppress or fabricate evidence); Richard v. State, 261 S.W. 
587, 588 (Tex. Crim. App. 1924) (proof that accused threatened or attempted to intimidate State's
witness admissible); see also Peoples v. State, 874 S.W.2d 804, 809 (Tex. App.--Fort Worth
1994, pet. ref'd) (attempt to intimidate or silence State's witness). Evidence that a witness has
been threatened or that someone has attempted to coerce her testimony is admissible to show the
accused's "consciousness of guilt." See Brown v. State, 657 S.W.2d 117, 119 (Tex. Crim. App.
1983) (threats against witness's family); Rodriguez v. State, 577 S.W.2d 491, 493 (Tex. Crim.
App. 1979) (threats against State's witness). Threats or other attempts at coercion are "hardly the
actions of an innocent accused," and evidence of such is every bit as probative of guilt as would
be flight by the accused. Rodriguez, 577 S.W.2d at 493.

 When considered collectively, we believe the facts shown are sufficient to tend to
connect appellant to the offense. A jury could have reasonably found that the accomplice's
testimony was corroborated. We overrule appellant's contention otherwise.


Legal Sufficiency of Evidence

 In reviewing a legal sufficiency challenge, we consider the evidence in the light
most favorable to the judgment and ask whether a rational trier of fact could have found all the
elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319
(1979); Williams v. State, 958 S.W.2d 186, 190-91 (Tex. Crim. App. 1997). The sufficiency of
the evidence is measured against the offense defined by a hypothetically correct jury charge. 
Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Appellant was convicted of capital
murder under an indictment that charged him with intentionally and knowingly causing the death
of Willie Herbert, Jr. by shooting him with a deadly weapon, a firearm, while in the course of
robbing him in Hays County on or about January 14, 1997. The court's charge instructed the jury
on the law of parties and in the application paragraphs instructed what findings were required in
order to determine that appellant acted either directly as a principal in committing the offense, or
as a party, by soliciting, encouraging, directing, aiding, or attempting to aid two other men, Rey
Ramirez and Bobby Trevino, to commit the offense. Appellant did not complain of the court's
charge and there is no dispute on the elements necessary to be proven. 

 The evidence reviewed above supports appellant's conviction. Considering the
evidence provided by the accomplice witness, and that of all the other witnesses, the evidence is
legally sufficient. The evidence shows appellant's participation in the murder, and establishes that
a part of the plan was to take the victim's wallet, that one of the parties checked the body to find
the wallet, and that five hundred dollars that he had only a short time before was missing. We
believe that this is sufficient evidence to show the aggravating element of robbery in the capital
murder. Appellant argues that there is not sufficient evidence without the testimony of the
accomplice witness. In evaluating the legal sufficiency of evidence of guilt, we must consider all
of the evidence, and this includes the accomplice witness testimony. McDuff v. State, 939 S.W.2d
at 614. We overrule appellant's legal sufficiency points contained in his issues two and four. 


Factual Sufficiency of Evidence

 Appellant's first and third issues contend that the evidence is factually insufficient
to support his conviction for capital murder. The court of criminal appeals has recently restated 
the correct rule of law for a factual sufficiency analysis. The court said:


 In Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996), we set out the
standards that courts of appeals should use in evaluating the evidence: 1) View all
the evidence without the prism of "in the light most favorable to the prosecution,"
and 2) set aside the verdict only if it is so contrary to the overwhelming weight of
the evidence as to be clearly wrong and unjust. Clewis v. State, 922 S.W.2d at
134; see also Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). They
should also "detail the evidence relevant to the issue in consideration and clearly
state why the jury's finding is factually insufficient . . . as to be manifestly unjust;
why it shocks the conscience; or clearly demonstrates bias. Further, [they] should
state in what regard the contrary evidence greatly outweighs the evidence in
support of the verdict." Clewis v. State, 922 S.W.2d at 135 (citations omitted); see
also Cain v. State, 958 S.W.2d at 407.



Mireles v. State, No. 172-98, slip op. at 3 (Tex. Crim. App. June 2, 1999).

 Removing the prism casting the light most favorably toward the State, the only
conflicting evidence to which appellant refers us concerns who had a white car on the date in
question. The chief investigator testified on cross-examination that Steve Emmons had been seen
driving a white Grand Am to take Bobby Trevino's wife to work, and Mrs. Trevino had stated that
Emmons drove her to work that day and kept the car. Emmons testified that Mrs. Trevino had
taken the car to work that day. Appellant does not explain the relevance of this conflicting
evidence. Appellant did not call any fact witnesses. Appellant points out, as the chief investigator
acknowledged, there was no physical evidence connecting appellant or his co-defendants to the
murder or robbery. No fingerprints from the scene were matched with any of the three who
committed the offense; no guns used in the murder were found or connected to appellant; no
money from the robbery was found. The victim's girlfriend admitted on cross-examination that
she had not actually seen five hundred dollars in appellant's possession, but she knew he had
money because he told her so that morning, and he had been spending money freely the day
before. Appellant bases his factual insufficiency argument on his perception of the weakness of
evidence, rather than on any substantially conflicting evidence. Appellant argued at trial that
Emmons could have been at the scene. Witness Donn Brooks was shown a photo line-up that
included a picture of Emmons, and Brooks did not recognize Emmons as one of the three men at
the scene of the crime. No evidence suggests that Emmons was a participant at the scene.

 Appellant has not shown that the verdict is contrary to the overwhelming weight
of the evidence so as to be clearly wrong and unjust. He has not pointed us to any evidence, and
we have found none, that would show the jury's finding is manifestly unjust, shocks the
conscience, or clearly demonstrates bias. The first and third issues are overruled.


Was Witness's Identification of Appellant Tainted by Hypnosis?

 Appellant's fifth issue contends that the trial court erred in admitting Donn Brooks's
identification of appellant because his testimony was tainted by an unsound method of hypnosis
which did not comply with the procedural safeguards set out in Zani v. State, 758 S.W.2d 233
(Tex. Crim. App. 1988). Appellant's pretrial motion to suppress Brook's testimony was
considered at a hearing and the trial court, based on its findings of fact and conclusions of law,
determined that the testimony was admissible. 

 While Donn Brooks was driving his truck on the road where the murder was
committed, he saw three men moving on the road and the body of a fourth. He gave oral and
written statements on January 14, 1997, the day of the offense. He described the persons he saw,
particularly the man whom he later identified as appellant. On January 22, 1997, he was
interviewed by Regis DeArza of the Hays County Sheriff's office who attempted to use hypnosis
as an interview technique. Before any use of hypnosis, Brooks described the scene and the people
he had seen on the date in question, and this statement was videotaped. He later described the
same events and people he saw after he was subjected to hypnosis, and this was also videotaped. 
Two weeks after the hypnosis session, on February 5, 1997, Detective Michael Chance showed
Brooks a photo lineup and Brooks picked appellant's picture as the person he saw at the scene. 

 In Zani, the court of criminal appeals stated:


We conclude that because of the uncertainties inherent in post-hypnotic testimony
it is appropriate to require the proponent of such testimony to demonstrate to the
satisfaction of the trial court, outside the jury's presence, by clear and convincing
evidence, that such testimony is trustworthy. In making its assessment of
trustworthiness the trial court should be alert to the four-prong dangers of
hypnosis: "hyper suggestibility," "loss of critical judgment," "confabulation," and
"memory cementing." . . . . Factors involved in determining trustworthiness of
hypnotic recall include, but are not limited to those we find in People v. Romero,
[745 P.2d 1003 (Colo. 1987)] at 1017:


"the level of training in the clinical uses and forensic applications
of hypnosis by the person performing the hypnosis; the hypnotist's
independence from law enforcement investigators, prosecution, and
defense; the existence of a record of any information given or
known by the hypnotist concerning the case prior to the hypnosis
session; the existence of a written or recorded account of the facts
as the hypnosis subject remembers them prior to undergoing
hypnosis; the creation of recordings of all contacts between the
hypnotist and the subject; the presence of persons other than the
hypnotist and the subject during any phase of the hypnosis session,
as well as the location of the session; the appropriateness of the
induction and memory retrieval techniques used; the appropriateness
of using hypnosis for the kind of memory loss involved; and the
existence of any evidence to corroborate the hypnotically-enhanced
testimony." 


 Obviously another factor would be the presence or absence of overt
or subtle cuing or suggestion of answers during the hypnotic session. If, after
consideration of the totality of the circumstances, the trial court should find by
clear and convincing evidence that hypnosis neither rendered the witness'
posthypnotic memory untrustworthy nor substantially impaired the ability of the
opponent fairly to test the witness' recall by crossexamination, he may admit the
testimony. See Hankins v. State, 646 S.W.2d 191, 203, n. 6 (Tex.Cr.App.1983)
(Miller, J., concurring and dissenting). The opponent should then be allowed to
adduce expert testimony before the jury pointing out both the dangers of hypnosis
in general, and any perceived defects in the particular hypnotic session.



Zani v. State, 758 S.W.2d 233, 243-44 (Tex. Crim. App. 1988) (footnotes and internal citations
omitted).

 The question on appeal is whether the trial court erred in its determination that the
State demonstrated by clear and convincing evidence that the post-hypnotic testimony and
identification of appellant by Brooks was trustworthy. In Soliz v. State, 961 S.W.2d 545, 548
(Tex. App.--San Antonio 1997, pet. ref'd), the court determined that the question of
trustworthiness of post-hypnotic testimony should be reviewed de novo, in accordance with
Guzman v. State, 955 S.W.2d 85, 87-88 (Tex. Crim. App. 1997). The San Antonio court
considered the issue a mixed question of fact and law that does not turn on an evaluation of
credibility and demeanor of witnesses. The court said, "The evaluating court is only required to
ascertain if the proper safeguards were used with the assistance of the Zani factors. The trial court
is not in a better position to make this evaluation than this court." Soliz, 961 S.W.2d at 548. For
purposes of this appeal, we will consider the matter de novo. The only other application of the
factors is in Zani v. State, 767 S.W.2d 825 (Tex. App.--Texarkana 1989, pet. ref'd) (hereinafter
Zani II, applying Zani I before Guzman was determined). We will consider each of these factors
in the instant case. 


 1. The level of training in the clinical uses and forensic applications of hypnosis
by the person performing the hypnosis. Captain DeArza testified that he was a forensic
hypnotist, trained at the Texas Department of Public Safety forensic hypnosis course in 1988. He
had passed the Texas Commission on Law Enforcement Officer Standards and Education test to
be a forensic hypnotist and had participated in in-service training in the field since that time. He
has conducted numerous hypnosis sessions and has used the training in fourteen criminal cases. 
He testified that he is aware of the dangers of hypnotizing people, including confabulation,
memory cementing, loss of critical judgment, and hyper suggestibility. He discussed each danger
and testified that he had been trained to guard against them. 

 2. The hypnotist's independence from law enforcement investigators,
prosecution, and defense. DeArza is an employee of the Hays County Sheriff's office, the 
agency conducting the murder investigation. However, he testified that he is in an entirely
separate division and is in charge of the narcotics division, which is housed in a separate building
from all other criminal investigative divisions. He did not know any details of the offense through
his position with the sheriff's office. He considered this separateness sufficient protection against
undue influence. 

 3. The existence of a record of any information given or known by the
hypnotist concerning the case prior to the hypnosis session. DeArza testified that all he knew
about the investigation was that there had been a murder in the Five-Mile Dam area and that the
individual to be hypnotized, a junior high school teacher, was an eyewitness to the murder. He
said that was all he needed to know and that it was a safeguard not to know more about the
investigation. In Zani II, the court quoted with approval this statement:


Perhaps the best safeguard against the hypnotist's influencing the person under
hypnosis by suggestions toward a description of a specific suspect is that the
hypnotist have a total lack of knowledge of the suspect. To the extent the hypnotist
lacks information, he is not in a position to bias, unduly influence, or contaminate
the hypnotized person's recollections.



Zani II, 767 S.W.2d at 836.

 Both the hypnotist and the detective in charge of the case testified that the hypnotist
was not familiar with the investigation and did not know the suspects or what they looked like. 
We must accept the trial court's implied finding of credibility on this point. 

 4. The existence of a written or recorded account of the facts as the hypnosis
subject remembered them prior to undergoing hypnosis. A copy of Brooks's written statement
made on the day of the murder, copies of the reports written by the officers who interviewed him
at that time, and a videotaped statement of what he remembered about the incident before the
hypnosis session began were all introduced in evidence at the hearing. Brooks's description of the
man he saw at the scene and later identified as appellant did not vary significantly in any of these
statements or reports and did not change during or after the hypnosis session. 

 5. The creation of recordings of all contacts between the hypnotist and the
subject. DeArza taped the interview and hypnosis session which shows both DeArza and Brooks. 
It does not show the chief investigator who attended the session, Detective Chance, except briefly
when he fetched a glass of water for Brooks, who coughed a great deal. DeArza testified that he
did not start the tape for about fifteen or twenty minutes when he and the subject were engaged
in a "rapport-building session" in which he explained his background so Brooks would feel
comfortable with DeArza. He testified that he did not discuss anything concerning the case during
this time before the taping was started. A failure to record all contacts between the hypnotist and
his subject, including the first few minutes of their contact, departs from the recommended
standard. Again, we rely entirely on the trial court's determination of the credibility of the 
hypnotist for that initial contact period. Nothing on the videotape suggests any undue influence
or inappropriate guidance by the hypnotist or anyone else. 

 6. The presence of persons other than the hypnotist and the subject during any
phase of the hypnotic session, as well as the location of the session. Detective Michael Chance
of the Hays County Sheriff's office was present at the session, but was not within the scope of the
video camera, except for a brief period. However, DeArza testified that Chance did not ask any
questions during the session and did not suggest any answers to Brooks. DeArza testified that
Chance was present "[b]ecause he was the case detective and, if there was any information elicited
there, he could take whatever notes he might want to." DeArza testified that if Chance had made
any comment during the session, it would have been heard on the audio portion of the tape. He
also testified that he thought that he would have noticed if Chance were signaling Brooks in some
way because he was watching Brooks's reactions carefully and he saw no indication of such
signaling. We accept the trial court's implicit finding that DeArza and Chance were credible
witnesses who did not try to influence Brooks's memories. 

 The session was conducted at the Hays County Law Enforcement Center in the
justice of the peace courtroom, a quiet and private place. Brooks was a former law enforcement
officer and said that Chance had been a student of his. While some people might be unduly or
subtly influenced by being in law enforcement surroundings, that does not seem to be an
appropriate assumption in this case. Brooks acted as a responsible and cooperative citizen who
immediately notified the authorities when he saw what he believed to be a murder in progress, and
then drove back to the scene to give law enforcement officers investigating the incident a statement
of what he had observed. Nothing in the record suggests he was subject to undue influence by the
investigative authorities just by being near the jail and law enforcement officers. 

 7. The appropriateness of the induction and memory retrieval techniques used. 
DeArza defined hypnosis as being in a relaxed state and described the procedures he used to
encourage the subject to relax. He considered the techniques used to be appropriate for the
interview with Brooks. He testified that neither he nor Chance overtly or subtly cued or suggested
any answers to Brooks. The videotape does not reveal any such suggestions or cues that Brooks
should remember particular facts. 

 8. The appropriateness of using hypnosis on the kind of memory loss involved. 
There was no testimony suggesting any evidence of memory loss on Brooks's part. It is not clear
why the hypnosis session was attempted before Brooks was shown photographic lineups. The
session was conducted only one week after the date of the murder, and Brooks was shown the 
photo lineups two weeks thereafter. The only suggestion in the record of what lost memory
information was being sought was elicited on DeArza's cross-examination at the pretrial hearing
when he testified that Chance was hoping to obtain a car license tag number if possible. Other
investigators advised Chance that the witness should not be exposed to a photo lineup before the
hypnosis session in order to avoid any possibility that showing photos could be considered too
suggestive to the subject. 

 9. The existence of any evidence to corroborate the hypnotically enhanced
testimony. Brooks's critical posthypnotic testimony included his identification of appellant's
picture in the lineup and identifying appellant at trial. The photo identification occurred several
months before Emmons agreed to testify and before he recounted his explanation of the events
surrounding the offense. Emmons's statement that appellant was present with a gun at the murder
and that he drove a small white car rented by appellant's wife corroborated Brooks's identification
testimony. The victim's girlfriend's testimony, that appellant was one of the three men who called
on the victim and frightened him severely on the night before the murder, also corroborates
Brooks's identification of appellant. 

 The State argues that there is serious doubt that Brooks was in fact hypnotized. 
DeArza testified that it was not possible for him to confirm if Brooks was actually hypnotized. 
He said that Brooks was not in a deep trance and at most might have been in a light one. At trial,
Brooks testified that he was not sure that the session "did more that just force me to concentrate
on what we were doing." The videotape of the session reveals Brooks coughed, had drinks of
water, and moved his body around many times during the session. In a murder case decided
shortly before Zani I, a sexual assault victim who witnessed the murder of her companion was
subjected to hypnosis. The court of criminal appeals noted that the subject's "hacking cough"
disrupted her hypnotic state on one occasion, and at another attempted session her cough
completely defeated efforts to hypnotize her. The court held that the woman's in-court 
identification was based on an independent origin from the hypnosis sessions and was admissible. 
Vester v. State, 713 S.W.2d 920, 922-23 (Tex. Crim. App. 1986). The State's argument suggests
we consider how ineffective hypnosis was in obtaining any relevant information from Brooks, and
in particular, how little possibility of undue influence the entire process had on Brooks's photo and
in-court identification of appellant. 

 Nothing in the record indicates any hypersuggestibility occurred or influenced
Brooks's identification of appellant. The hypnotist did not know what any suspect looked like and
did not make any identifying suggestions on the tape. Brook's description of the man he saw at
the scene remained constant from his first statement to his testimony at trial. Confabulation occurs
when the person hypnotized creates memory perceptions in an unconscious effort to please the
hypnotist. Zani II, 767 S.W.2d at 837. During the session, no one made suggestions for Brooks
to follow. However, Brooks did possibly engage in some confabulation because, without urging,
he came up with a license plate number for the small white car. This "memory" in no way
matched the license plate of the rental car in question. DeArza was surprised when Brooks started
to report this item that he believed he had remembered. However, there is no suggestion in the
record that Brooks was influenced by hypnosis to add to his memory of the person he saw and
identified as appellant. Loss of critical judgment refers to a hypnotized subject's decreased ability
to make a mental evaluation of his ideas, images, and feelings. Zani II, 767 S.W.2d at 837. Other
than the incident of Brooks's apparently false memory of the license plate numbers, there is
nothing in the record to suggest that Brooks was influenced to a loss in critical judgment. Most
importantly, the descriptions of the man Brooks saw remained consistent from his first contact
with law enforcement to trial, and he was not exposed to any photographs or other descriptions 
during the hypnosis session that might have influenced him to a different identification. Memory
cementing occurs when a subject goes over the memory in his mind a number of times, and
becomes more convinced of its accuracy by this process. Id. Again, the consistency of Brooks's 
description was an important indication that the hypnosis session did not serve to plant a new
memory which was then reinforced by repetition. 

 We conclude that the trial court did not err in admitting Donn Brooks's post-hypnotic testimony and identification of appellant. Our review convinces us that there was clear
and convincing evidence that Brooks's testimony was trustworthy despite the hypnosis session. 
We agree with the trial court that the hypnosis neither rendered the witness's post-hypnotic
memory untrustworthy nor substantially impaired the ability of the opponent fairly to test the
witness's recall by cross-examination. We also note that at trial, Brooks was thoroughly cross-examined on all of his testimony, and appellant had a well-qualified expert to critique the hypnosis
session and to explain the dangers of hypnosis. Appellant's fifth issue is overruled.


Conclusion 

 Having overruled appellant's five issues, we affirm the judgment of the trial court.



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices Kidd and Patterson

Affirmed

Filed: August 26, 1999

Do Not Publish



t force me to concentrate
on what we were doing." The videotape of the session reveals Brooks coughed, had drinks of
water, and moved his body arou